[L. A. No. 5532.   In Bank.—February 25, 1922.]

# LOS ANGELES GAS & ELECTRIC CORPORATION (a Corporation), Appellant, v. THE CITY OF LOS ANGELES (a Municipal Corporation), et al., Respondents.

[1] MUNICIPAL CORPORATIONS—ELECTRIC POWER—DISTRIBUTING SYSTEM —Los Angeles Charter—Construction.—The purpose of subdivision 41 of section 2 of the charter of Los Angeles is to require the city to acquire by purchase or construction of a distributing system adequate to serve the citizens of that city with the electrical energy which it owns, rather than for the city to sell its power to others to retail to consumers.

[2] ID. — CONTRACT FOR PURCHASING DISTRIBUTING SYSTEMS AND FOR DISTRIBUTION OF ELECTRIC POWER—VALIDITY OF.—A contract between the city of Los Angeles and two private corporations having for its purpose the acquiring by the former of the distributing systems of the latter and pending the consummation of the purchase it being agreed that the systems should be used to distribute power generated by the city and by the companies to the consumers of the companies in the city, the private corporations agreeing to distribute the electrical energy of the city to the consumers then served by those corporations within the city limits and to collect from the customers for such service, the funds derived from the sale of such electrical energy to be applied by the companies in the manner specifically agreed on in the contract, sufficient of the returns to be retained by the companies to pay a certain percentage upon the purchase price of the plants as fixed in the agreement of purchase and upon the severance damage allowed in connection with the sale, does not violate a provision of the charter of the city prohibiting a sale by the city of its electric energy at wholesale, unless authorized so to do by a two-thirds vote of the electors of the city, as it is a contract to buy rather than to sell electricity.

[3] ID.—CONSTITUTIONALITY OF CONTRACT.—Such a contract does not violate section 31 of article IV of the constitution in resulting in making a gift by the city of its property or extending its credit.

[4] ID.—CONSTRUCTION OF SECTION 31, ARTICLE IV, OF THE CONSTITUTION.—Section 31, of article IV of the constitution is a limitation upon the power of the state legislature, and has no application to a city operating under a freeholders' charter, which is subject only to the restrictions and limitations provided in its charter, and with respect to other matters it is subject to and controlled by general laws.

[5] Id. — Municipal Affair — Sale and Distribution of Electrical Energy.—The sale and distribution of electrical energy manufactured by a city is a municipal affair and one over which the legislature of the state has no control.

[6] Id.—Construction of Contract.—Such contract does not purport to give away electrical power of the city and does not in fact do so, but, if there is no adequate return to the city from its power so distributed, it will be because of insufficient retail price to cover the expense of generating and distributing the power, and not because anything has been given to the contracting corporations.

[7] Id.—Partnership.—Such a contract does not establish a business partnership.

[8] Id.—Los Angeles Charter—Construction.—A fair construction of subdivision 41 of section 2 of the Los Angeles charter would seem to require that where the electrical power of the city is to be sold at wholesale to be distributed to the citizens of Los Angeles, the consent of two-thirds of the voters must be secured, whether or not the power is surplus. The evident purpose of the proviso was to permit the sale of power to outside municipalities and consumers of energy when such power was not needed within the city itself and was therefore "surplus power."

[9] Id.—Letting of Contract—Section 207a, Los Angeles Charter—Construction.—Such a contract is not one required to be let only after advertisement and to the lowest bidder, under section 207a of the Los Angeles charter.

APPEAL from a judgment of the Superior Court of Los Angeles County. John W. Shenk, Judge. Affirmed.

The facts are stated in the opinion of the court.

Paul Overton, Samuel Poorman, Jr., S. W. Guthrie, Herbert J. Goudge, H. C. Beach and J. H. Powell for Appellant.

Albert Lee Stephens, City Attorney, Charles S. Burnell, City Attorney, William B. Himrod, Lewis E. Whitehead, W. B. Mathews, Roy V. Reppy and Gibson, Dunn & Crutcher for Respondents.

WILBUR, J.—This action is brought by the plaintiff as a taxpayer of the city of Los Angeles to enjoin the carrying out of a certain contract entered into by the city of Los Angeles with the Southern California Edison Company and

with the Pacific Light & Power Corporation for the distribution of the electric energy developed by the power plants owned by the city. The city of Los Angeles has developed hydro-electric power in bringing water from the Owens River to the city of Los Angeles. Thirty-seven thousand five hundred horse-power is developed in San Francisquito canyon. The city is empowered by its charter to develop and sell electrical power. The question involved in this case is whether the city has violated a provision of the charter hereinafter quoted which prohibits the sale by the city of its electric energy at wholesale unless authorized so to do by a two-thirds vote of the electors of the city. The question, then, is, whether or not the contract in question makes a sale of electric power by the city within the prohibition of the charter. It appears that the city has a distributing system which uses less than ten per cent of the power developed at the San Francisquito plant. Until a distributing system can be constructed or purchased for the distribution of the balance of such electric energy to consumers ninety per cent of the hydro-electric power which would otherwise be developed at this plant must go to waste and become a total loss to the city unless it can be sold to or distributed by those having adequate distributing systems. In view of this situation the city of Los Angeles was confronted with the problem of either acquiring existing distributing systems in the city of Los Angeles or of constructing a sufficient distributing system of its own. The city officials of the city adopted the plan of purchasing the existing distributing plants of the Pacific Light & Power Corporation and the Southern California Edison Company. In order to consummate this purchase it was essential for the city to issue bonds and to secure the necessary consent of two-thirds of its electors expressed at an election to such bond issue. An election was agreed to be called June 7, 1917. Pending the holding of such an election the contract under attack in this action was executed between the city and the companies having such distributing plants. By this contract the city proposed to enter into an agreement to purchase the distributing plants of these two corporations at a price fixed in the proposed agreement and under conditions therein specifically set forth, subject, however, to the ap-

proval of the voters voting at the bond election thereafter to be held.

The contract covered the period from May 1, 1917, to July 1, 1917, subject to extension at the option of the city to July 2, 1919, and subject to termination during that period at the option of the city upon three months' notice, and provided that the contract should terminate upon the purchase and transfer of the distribution system to the city under the agreement therefor, a copy of which proposed agreement of purchase was attached to and made a part of the contract. In this proposed contract of purchase the price to be paid for the distributing system within the city of Los Angeles was fixed at $8,270,000, plus such sum as the Railroad Commission should fix as the value of the distributing system in the Westgate annexation district, as such system existed on January 1, 1917, plus moneys expended for extensions and betterments of such systems after January 1, 1917, until the transfer to the city, plus $1,145,000 severance damage, less $21,600 to be deducted annually therefrom under the operating contract, all payable on or before July 1, 1919. Said amounts to be paid only from the proceeds of bonds authorized by the voters for such purpose, the city to agree in the proposed agreement to purchase from the companies all electricity required in excess of the supply produced by the city from its generating plants, and not less than 25,000 horse-power.

Pending the consummation of the contemplated purchase of the distributing system, it was agreed that the system should be used to distribute power generated by the city and by the companies to the customers of the companies in the city. By this arrangement the corporations agreed to distribute the electrical energy of the city to the consumers then served by those corporations within the city limits. The companies also agreed to collect from the consumers for such service. The funds derived from the sale of such electrical energy to the consumers were to be applied by the companies in the manner specifically agreed on in the contracts. Sufficient of the returns from the sale of electrical energy were to be retained by the corporations to pay eight per cent upon the purchase price of the plants as fixed in the agreement of purchase and sale and upon the severance damage allowed in connection with the sale,

a damage fixed, no doubt, in the light of the principle of eminent domain by which severance damage, if any, is allowed in the event of condemnation. Three and thirty-six one hundredths per cent upon these values was to be paid into a trust fund to be applied to repairs and improvements necessary to maintain the plants and make necessary extensions and the balance thereof to be disposed of in connection with the sale in accordance with the agreement of the parties by which, in case of a sale, it was planned to make the city whole on its purchase, either by the replacements and extensions made from time to time, or by the payment to it from this fund of the estimated depreciation. Other provisions in the contract with reference to the operation of the power lines during the period in which the title remained in the vendor need not be specifically stated except to state that the general management of these distributing systems was to be in the companies subject to the control of a board of four persons, two to be chosen by the city and two by the companies, and in the event of a disagreement a fifth to be selected as referee. One of the most important features of the plan was the agreement that the city should purchase from the corporations, both before and after the sale, about 25,000 horse-power of electrical energy, the amount and price of which is minutely specified in the agreement.

The entire scheme covered by the contract is one for the distribution of 62,500 horse-power of electrical energy to customers mostly within the city of Los Angeles, 25,000 of it to be supplied by the companies and 37,500 by the city. The contract specifically provides that the city is to purchase the 25,000 horse-power from the electrical and power companies and that the power lines of the companies are to be used for the distribution of the electrical energy of the city. Of course, it must be conceded that if this terminology was adopted as a mere subterfuge to conceal the real nature of the transaction and if the actual transaction is one prohibited by the charter, the mere terminology used by the parties should not be controlling. It is, however, significant that the agreement, as expressed by the parties thereto, is one by which the city is to purchase the distributing system of the corporations and in addition thereto to purchase 25,000 horse-power of electrical energy from the corpora-

tions, and not one for the sale of power by the city to the companies.

There is no agreement whatever on the part of the city to sell electrical energy to the companies, unless it be determined that, notwithstanding the ostensible nature and character of the transaction, the actual agreement was to sell electrical energy at wholesale. The charter provision relied upon by the plaintiff in this action, subdivision 41 of section 2, is as follows:

" . . . And no electric power now or hereafter owned or controlled by the city shall ever be sold, transferred, leased or disposed of to any person or corporation for resale, rental, disposal or distribution to consumers, or other persons, without the assent of two-thirds of the qualified voters of said city given as aforesaid; provided, that nothing in this subdivision contained shall be construed to prevent the ordinary sale and distribution by the city of electric power, belonging to the city, to the inhabitants thereof, or persons doing business therein, for their own use, or to prevent the distribution or supplying, by the city, of surplus electric power not required by the city for distribution to consumers within its limits, to consumers outside of the limits of the city, for their own use, or to other municipal corporations for municipal use, or for resale and disposal by such municipal corporations to consumers within such municipalities, respectively."

Substantially the same provision is also found in section 191.

[1] It is evident that the purpose of this charter provision is to require the city to acquire by purchase or construction of a distributing system adequate to serve the citizens of the city of Los Angeles with the electrical energy which it owns, rather than for the city to sell its power to others to retail to consumers. It would be disastrous if this provision should be construed so that during the period necessary for the construction or acquisition of a distributing system the enormously valuable power rights of the city should be almost wholly wasted. It is stated in the briefs that the amount of revenue to be derived by the city during the pendency of this contract, that is, up to the first of July, 1919, would be in excess of $1,000,000, and the

actual returns received by the city are in excess of $2,000 per day.

Upon the argument upon rehearing it was stated that the returns from this contract already paid over to the city to August 31, 1921, amounted to $3,824,899, of which amount $1,140,755 had been paid for the first eight months of 1921. It is evident that these general restrictions of the charter were not adopted with a view to providing for the hiatus between the acquisition of power generating and power distributing systems by the city, but rather to the management of both when acquired, and to compel the acquisition of both.

[2] Was the arrangement between the city and the companies a "sale" of electrical energy by the city to the companies prohibited by the charter?

The scheme adopted by the city authorities for the distribution of this power by which it is served directly to the consumers within the city limits and by which the amount paid by the consumers goes directly to the city or inures to its benefit in the extension and maintenance of an electrical distributing system to be purchased by the city is certainly not a violation of the spirit of the charter, which commits the city to the scheme of retail distribution as distinguished from a wholesale distribution of its power, but is in accord with such purpose. If the system adopted is not a violation of the spirit of the charter, the question remains whether or not it is a violation of the letter thereof. It is not a violation of the letter of the charter, for the reason that instead of being a sale by the city at wholesale of its electrical energy it is, on the contrary, an arrangement by which the city not only serves its own electrical energy directly to the consumers, constituting the distributing corporations its agents for that purpose and for the collection and disbursement of those returns in accordance with an agreement for the purchase and sale of the plant, but also one by which the city agrees to purchase from the vendors, not only during the period in which the distributing systems remain in their possession before purchase, but subsequent to the final consummation of such purchase, electrical energy amounting to 25,000 horse-power. Instead of an agreement on the part of the city to sell electricity, it is an agreement to buy electricity. It is true

that the scheme proposed results in the defendant companies actually collecting from the consumers the price of electrical energy furnished to them; that it also provides for the retention by the companies of sufficient of the amounts so collected as would give to them eight per cent income upon the value of their property used in the distribution of the electric energy. Speaking in terms of substance rather than in detail, the agreements referred to are more in the nature of an agreement regulating the use and possession of property for the buyer and seller pending the consummation of the sale thereof.

The trial court denied the injunction sought and plaintiff appeals.

The appellant argues that the actual transaction between the city and the companies was a sale, whatever the contract on its face may be; that it was considered and treated by the parties as a sale of power *by* the city to these companies for which they paid the city at the rates fixed in the contract for the sale of the power *by* the companies, and that the actual returns made to the city are so nearly in accord with such supposition as to justify the conclusion that the parties intended the language of the contract as a mere subterfuge to conceal the real intent of the city officials entering into the agreement. In other words, that the schedule of prices for electricity stated in the contract is really intended to be for exactly the opposite purpose than what the contract states it to be, namely, a sale *by* the city instead of a sale *to* the city. Neither the city nor the companies are bound by such an understanding or intention, if inconsistent with the terms of the written contract. If the agreements between the city and the companies are valid agreements and in accordance with the charter, they will not be held to be invalid because the conduct of the city officials in executing them violates both the charter and the contract. While the actual payments made during the month of May by the companies to the city average about $2,000 per day, a total of $62,913, such payments are not a contract price for 5,844,520 kilowatt hours furnished *by* the city. The circumstances that the ratio between the total amount already paid to the city and the amount of the power so far furnished by the city gives a price per kilowatt hour to the city approximating

the rate fixed in the contract for power furnished *by* the companies is not material. The litigation was begun the day the contract went into effect. Under the terms of the contract payments were to be made daily by the companies to the city and such payments would necessarily be an approximation of the amounts due under the contract. The contract provides for the adjustment of payments in accordance with the terms of the contract monthly. The contract provision with reference to the payments is as follows: ''The companies shall collect from consumers all money for electric energy supplied to consumers, and shall pay or cause to be paid to the city daily as collected all sums collected on account of electric energy furnished after the execution of this agreement under and by means of said distributing systems less such percentage of such sums as is to be retained and received by the companies under provisions of paragraph 'H' of this agreement. The amount of such deductions from daily collections shall be determined by the parties hereto as accurately as may be practicable subject to more complete and final adjustment, settlement and payment to the party to whom such payments may be due, on or before the tenth day of each calendar month, covering all collections during the preceding month.'' Until such settlement it will not be known exactly what amount of the returns from the sale of power to the consumers will be paid to the city.

[3] In this connection it should be observed that the appellant claims that the city, under this agreement, might get nothing for its power, a contention hardly consistent with the claim that the contract provides for a sale of 37,000 horse-power at a fixed price. This argument is made in connection with the contention that section 31 of article IV of the constitution is violated in that the city has made a gift of its property or has extended its credit in violation of the provisions of the constitution. Appellant's statement is as follows: ''But more than this. Nowhere in this agreement are the companies obligated to pay the city one cent for the city's power 'merged into' the distributing systems of the companies. Oh, yes, say these self-same public officials, we get what is left after the companies receive the various specified items. But what if the answer should be like the reply of the little boy when asked for the core of his

apple—'there ain't going to be no core.' There is no obligation on the companies to have anything left. They conduct the business as they see fit—they take their share of the partnership first—and the devil take the hindmost. A more flagrant violation of the constitutional provision can hardly be imagined. That such things could be demonstrates the necessity and reason for the rule.''

It would seem that the determination as to whether or not the so-called operating agreement is in effect a sale of electrical energy at wholesale to the contracting companies, or is a method of distributing the power of the city to its consumers, would turn in part upon the question as to whether or not the return to the city would be regulated solely with reference to the quantity of power furnished by the city. If the contract was so arranged that the city would at all times receive a definite amount for the power furnished, regardless of the hazards of the business or the expense of distribution, then it might be argued with some force that it was a sale within the meaning of the charter prohibiting such a transaction. On the other hand, as the arrangement is such that the city merely pays for the use of a distributing system an amount fixed by the contract and receives all the money paid by the retail consumers except amounts so paid to the contracting companies for the use of their system, it would seem clear that the transaction is not a sale of power by the city to the companies. Furthermore, as the contract is so adjusted that an increase of rates paid by the consumers would not inure to the benefit of the distributing companies, but to the benefit of the city, it would seem clear that there had not been a sale or transfer of electrical energy to the companies as contemplated by the charter. Under the contract in question, if the rates to the retail consumer are doubled the city would reap the entire benefit of the increase. Whereas, if the city distributes at a fixed wholesale rate and the retail price is increased, the benefit of such increase would go to the retailer and not to the wholesaler. The contract seems to be a reasonable arrangement, honestly made, to bridge over a necessary period during which the city is seeking to acquire these distributing systems, so as to comply with the charter in its sale of power, and it

is not so framed as to violate either the letter or the spirit of the charter.

It is contended by the appellant that if the contract in question be construed as a lease that it is invalid and in violation of section 51a of the Public Utilities Act [Stats. 1915, p. 149], without the consent of the Railroad Commission. As we understand the record, such consent has been obtained, and the appellant does not press the point.

As already stated, appellant contends that the contract violates section 31 of article IV of the constitution, prohibiting the legislature from giving or lending, or authorizing "the giving or lending of the credit of the state, or of any county, city and county, city, township, or other political corporation or subdivision of the state now existing, or that may be hereafter established, in aid of or to any person, association or corporation, whether municipal or otherwise, or to pledge the credit thereof in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever. . . . "

[4] This provision of the constitution is in the article regulating the powers of the legislative department of the state government and is a limitation upon the power of the state legislature. The powers of the city of Los Angeles are not derived from the legislature, but from a freeholders' charter directly provided for by the constitution. That is to say, the people of the state through the constitution authorize the people of the city to regulate its affairs by a charter to be framed by a board of freeholders and voted upon by the people of the city and approved by a resolution of the legislature. Section 31 of article IV has no application to a city charter. It is expressly provided by the constitution, article XI, section 6, that the city in its charter may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws. [5] The sale and distribution of electrical energy manufactured by a city

is a municipal affair and one over which the legislature of the state has no control.

[6] It may be said, also, that the contract complained of by the appellant does not purport to give away the power of the city and does not in fact do so, and that if there is no adequate return to the city from its power so distributed it will be because of insufficiency of the retail price to cover the expenses of generating and distributing the power and not because anything has been given to the contracting corporations. [7] The argument of the appellant, however, is based upon the contention that the contract establishes a business partnership and that such a partnership is *per se* a violation of article IV, section 31, of the constitution. In this behalf they cite the case of *Walker* v. *Cincinnati*, 21 Ohio St. 14 [8 Am. Rep. 24], quoting the following therefrom: "The mischief which this section interdicts is a business partnership between a municipality or subdivision of the state, and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever." To the same effect they cite the case of *Hunter* v. *City of Roseburg*, 80 Or. 588 [156 Pac. 267, 157 Pac. 1065]. (See, also, *Alter* v. *Cincinnati*, 56 Ohio St. 47 [35 L. R. A. 737, 46 N. E. 69].) A situation more nearly parallel to that involved in this case is that of *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110 [Ann. Cas. 1914A, 1054, 99 N. E. 241], involving a contract between the city of New York and the Interborough Rapid Transit Company and another with the Brooklyn Union Elevated Railroad Company. It was held that the contracts in that case did not violate a constitutional provision similar to our article IV, section 31, the arrangement there being for the use of certain subways belonging to the city, the construction of additional subways and elevated railroads and the operation thereof jointly with the old lines as a single system, and providing for payment to the respective parties in accordance with their respective interests. The contract was sustained. Because of our view as to inapplicability of the constitutional provision relied upon (art. IV, sec. 31), we do not pursue this matter further, although it is clear that such an arrangement as is here made could hardly be classed as a partnership,

and the mingling of capital is merely incidental to the purchase and sale of a distributing system which the city is clearly authorized to purchase.

It is urged by the city that the city power distributed by these systems is "surplus power" and therefore the consent of the voters is not required by the charter. [8] A fair construction of the charter would seem to require that where the power is to be sold at wholesale to be distributed to the citizens of Los Angeles, the consent of two-thirds of the voters must be secured, whether or not the power is surplus. The evident purpose of the proviso was to permit the sale of power to outside municipalities and consumers of energy when such power was not needed within the city itself and was therefore "surplus power."

[9] It is contended that if the contract in question is in substance and effect an agreement to purchase 25,000 horse-power of electricity from the companies, it is violative of section 207a of the charter, requiring a letting to the lowest responsible bidder after advertisement, where contracts involve an expenditure of more than $500 by the city. We think it clear that the arrangement entered into with the companies, however it may be characterized, is not a contract required to be let only after advertisement and to the lowest bidder. The power to be supplied by the companies could not be obtained elsewhere and is furnished by public service corporations for distribution to customers already entitled to that service. The case of *Contra Costa Water Co.* v. *Breed,* 139 Cal. 432 [73 Pac. 189], seems to support this view under somewhat similar charter provisions of the Oakland charter. (See, also, on this general subject, section 802 of Dillon on Municipal Corporations, 5th ed.) The time fixed for the termination of the contract (July 1, 1919) has already passed, but, by reason of the fact, admitted by counsel that it has been extended from time to time and is still in force, we have not considered the issuance of an injunction a moot question.

A rehearing was ordered to correct an erroneous statement as to the execution of the contract of purchase as distinguished from the operating contract to which the proposed form of the contract of purchase was attached, and to consider the effect of such error. We are satisfied

with our former conclusion and, with some minor changes, have adopted the former opinion.

Judgment affirmed.

Lawlor, J., Shurtloff, J., and Sloane, J., concurred.

SHAW, C. J., Concurring.—The agreement which is the subject of this controversy, when stripped of matters of detail and description, is nothing more than an arrangement between the city of Los Angeles and the two public service corporations named therein whereby, pending the final consummation of a proposed sale to the city of their electric distributing plants, the two corporations undertook to distribute to consumers in the city of Los Angeles, by means of their existing systems of distribution, the electricity generated by the city in its own power plant and a sufficient amount of additional electricity from their own plants to supply the wants of such consumers, which additional electricity was thereby to be considered as sold by said corporations to the city for that purpose, and to collect for the city the money due from such consumers for the electricity so distributed to them. The city on its part agreed that the two corporations, as compensation for such services to the city, should retain a certain fixed percentage of the money collected from consumers and should pay over to the city the balance thereof.

I cannot see that by such agreement the city has "sold, transferred, leased or disposed of" any electric power "to any person or corporation for resale, rental, disposal or distribution to consumers," within the meaning of subdivision 41, section 2, of the city charter. (Stats. 1911, p. 2066.) To the contrary, it seems clearly to provide for a purchase of electric · power by the city from said corporations of enough additional electric power to supply its consumers, and for the distribution and sale of the city's electric power, including the power so purchased, by and through the two corporations as its agents for that purpose. This does not contravene the provisions of the charter aforesaid.

I concur in the conclusion that the judgment of the court below be affirmed.