## UNITED STATES v. CITY AND COUNTY OF SAN FRANCISCO.
### No. 4173–R.

District Court, N. D. California, S. D.
April 11, 1938.

Frank J. Hennessy, U. S. Atty., and W. E. Licking, Asst. U. S. Atty., both of San Francisco, Cal., and Frederic L. Kirgis, of Washington, D. C.

John J. O'Toole, City Atty., Dion R. Holm, Asst. City Atty., and Robert M. Searls, all of San Francisco, Cal., for defendant.

ROCHE, District Judge.

This is a suit in equity wherein the United States of America, as plaintiff, seeks to restrain the City and County of San Francisco, as defendant, from continuing an activity which is alleged to be in violation of a restriction attached to a grant of lands by the plaintiff to the defendant. The grant is known as the Raker Act (38 Stat. 242), passed by Congress on December 19, 1913. The restriction in question, contained in section 6 of the act, 38 Stat. 245, reads as follows: "That the grantee is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the said grantee."

Pursuant to the Raker Act the City and County of San Francisco built a water and power system. Because the defendant lacked an electric distribution system within its territorial limits and was not able to build or purchase one at the time that electric energy was ready for delivery to consumers, it entered into a contract on July 1, 1925, for the disposal of electricity to the Pacific Gas & Electric Company. The plaintiff claims that under this contract the defendant is disposing of electric energy, developed and transmitted by it through its utilization of the rights granted the defendant in and on government lands by the Raker Act, in violation of the condition or restriction attached to that grant by the above-quoted provision in section 6 of the act. Plaintiff is proceeding to compel compliance under section 9(u) of the act, which reads as follows:

"That this grant is made to the said grantee subject to the observance on the part of the grantee of all the conditions hereinbefore and hereinafter enumerated: * * *

"u. * * * That the grantee shall at all times comply with and observe on its part all the conditions specified in this Act, and in the event that the same are not reasonably complied with and carried out by the grantee, upon written request of the Secretary of the Interior, it is made the duty of the Attorney General in the name of the United States to commence all necessary suits or proceedings in the proper court having jurisdiction thereof, for the purpose of enforcing and carrying out the provisions of this Act."

Hereinafter for convenience the plaintiff will be designated as the Government, the defendant, as the City or S. F., and the Pacific Gas & Electric Company, as the Company or the P. G. & E.

On August 24, 1935, the Secretary of the Interior rendered an opinion which declared that the City's disposal of electricity under the contract with the Company was in violation of the quoted part of section 6 of the Raker Act. The City, upon being advised of the Secretary's opinion and requested to cease its activity, gave notice that it intended to continue disposing of its electricity under the contract of July 1, 1925, until restrained from so doing by court action. Thereafter the necessary steps were taken by the Secretary to place the matter in the hands of the Attorney General of the United States, who commenced these legal proceedings as provided for in the Raker Act.

The complaint of the Government alleges that the City is presently selling the electric power, generated by utilization of the grants of the Raker Act, to the P. G. & E. for resale, and that such activity is in violation of the limiting provision of section 6 of the act. The City denies this allegation and sets up the contract with the Company as Exhibit A of its answer as a primary defense for the activity which the Government contends is a sale for resale. In addition S. F. maintains that, even if the contract should be construed to be an arrangement for the sale of electricity for the purpose of resale, there are mitigating circumstances which make the issuance of an injunction improper. Estoppel, good faith, and reasonableness of actions, balance of conveniences, change of conditions, and impossibility are urged as equitable defenses. Invalidity of the restriction, as in excess of the powers of Congress, is also claimed. These various defenses the court regards as secondary and will subsequently refer to them as such.

Before examining the facts and the law pertaining to the issues raised by the parties, it is necessary to understand the background for the litigation. Therefore the court will present a brief history of the Hetch Hetchy project, with particular reference to the City's activities in the generation and transmission of electric energy. Thereafter the court will dispose of its problems by an examination of them in the following order: (1) The restriction in section 6 of the Raker Act; (2) the question raised by the City's secondary defenses—the legal effect of the restriction in the grant; (3) the nature of the contract between the City and the Company; (4) certain arguments made by the City as to the construction of the contract.

### History of the Project.

On December 19, 1913, the Raker Act was passed by Congress. It granted certain federal lands and rights to S. F. upon the condition that the water and power to be obtained from the contemplated project would be sold by the City directly to its inhabitants.[1]

The act was the culmination of persistent efforts on the part of San Franciscans to assure themselves of adequate water and low rate electricity for their growing city. Work was begun on the Hetch Hetchy dam and power stations in the Yosemite region of the high Sierras soon after the act became law. By 1923 the City was disposing of electric energy which it derived from the Early Intake power station (built as a preliminary unit for the construction of Hetch Hetchy itself).[2] On May 8th of that year the National Park Service started proceedings through the then Secretary of the Interior against the City. San Francisco's mode of distribution of Early Intake electricity through the facilities of the P. G. & E. was questioned. After proper hearings, it was determined that energy was being sold to the Company in violation of the provisions of the Raker Act. Since the Moccasin Creek Power Plant (the chief future source of power for S. F.), was nearing completion at the time this decision was rendered, it was essential that a new plan for distributing electricity be adopted as soon as possible.

To avoid further violation of the law governing Hetch Hetchy power, S. F. entered into a contract with the P. G. & E. in 1925, whereby arrangements were made for the utility company to distribute the

---

[1] Section 9(m) of the Raker Act, 38 Stat. 245, gave to the grantee certain water rights in addition to the lands granted. Since the court does not deem this feature of the act necessary to the decision, it does not discuss it in the opinion.

[2] Although Early Intake power was disposed of under a different arrangement from that of the Moccasin Creek Plant until the last few years, the court will treat S. F. power as a unit, since it is now all handled under the contract of 1925.

City's energy on its behalf. The contract of July 1, 1925, was an attempt to set up an agency agreement which would comply with the terms of section 6 of the Raker Act. Under this contract, City power was to be turned over to the Company at its Newark substation, about 35 miles southeast of S. F. The Company was to pay the City on a 75 per cent. load factor basis for electricity made available by the Hetch Hetchy power plants.[3] Line losses, estimated at 24 per cent. of the energy received by the Company at Newark, were to be deducted from the electricity actually delivered, in determining payments due to the City. Of the money collected from San Francisco consumers of electricity supplied by the Hetch Hetchy power plants, the City was to receive 26.935 per cent. and the Company, 73.065 per cent. These proportions were to be applied to the payments made by customers, who were charged 2.383 cents per kilowatt hour at the time the contract went into effect. As rates were varied, the payments were to be adjusted accordingly, so that the percentages remained fixed during the life of the contract between the City and the Company. The City was to be paid by the Company whether the latter used all of the Hetch Hetchy power or not, and whether the Company "load dispatcher" accepted the energy generated in the City power plants at Moccasin Creek and Early Intake in whole or in part. The contract was made terminable on one day's notice by either side or upon the request of the Secretary of the Interior, should he find it to be in violation of the Raker Act.[4]

In 1925 the new contract between the City and the Company became operative, with the parties to it hoping that the arrangement heeded the admonition against resale of electricity which was set forth in section 6 of the act. Thereafter verbal and written encounters took place intermittently between the City and the Government, but it was not until 1934 that the present controversy threatened to reach legal proportions. In that year the Secretary of the Interior started an investigation to determine whether S. F. was complying with its obligations under the Raker Act. The results of conferences, hearings, and study were contained in an opinion of the Secretary, who concluded that the act was being violated (Plaintiff's Exhibit 11). The subsequent proceedings by which a suit arose and reached the United States District Court have been outlined above.

The chief issue to be settled by the court in the present controversy is this: Does the City's present disposal of electric power under the contract of July 1, 1925, made by the City and the Company, violate section 6 of the Raker Act?

### The Restriction in Section 6 of the Raker Act.

As a necessary preliminary to a study of the contract, the conditions set forth in section 6 must be carefully examined in order to ascertain what kind of arrangement would be permitted between the City and the Company. The court again recites the language in section 6: "That the grantee is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the said grantee."

What was intended by Congress when it placed this prohibition in the Raker Act? An approved method of approach for obtaining an answer to this question was stated in the case of Oregon & California Railroad Co. v. United States, 1915, 238 U.S. 393, at page 417, 35 S.Ct. 908, 918, 59 L.Ed. 1360, where the Supreme Court said: "To construe a statute we must realize its inducements and aims, solving disputes about them by a consideration of what might accomplish or defeat such aims."

The aims of the Raker Act were made apparent by both the Senators and the Representatives who discussed the bill during the months preceding its passage in 1913. Pertinent remarks are those of Representatives Sumners, Raker, and Thompson before the House of Representatives and of Senator Norris before the Senate:

Representative Sumners: "Is it the purpose of this bill to have San Francisco supply electrical power and water to its own people?" Representative Raker: "Yes." Representative Sumners: "Or to supply

---

[3] Load factor—ratio of average load to capacity.

[4] This latter provision in the contract must not be confused with section 9(u) of the Raker Act, under which section the Secretary must start proceedings through the Attorney General, if the act is being violated by a sale of electricity to a private company for purposes of resale.

these corporations, which will in turn supply the people?" Representative Raker: "Under this bill it is to supply its own inhabitants first. * * *" Congressional Record, vol. 50, p. 1905 (1913).

Representative Thompson: "* * * San Francisco may sell this water or electric energy to whom? * * * under this section (six), it is absolutely impossible for San Francisco to sell a drop of water or a bit of electric energy to any private individual or to any corporation for the purpose of reselling it."

In response to the question of a Congressman who feared that a private company might resell electricity which the company had purchased from the City: "And it should be added that that lessee, unless it is a municipal corporation, is by the terms of the bill confined to somebody who wants to use this for consumption." Congressional Rec. vol. 50, p. 4097.

Senator Norris: "* * * This bill is not giving to a private corporation any power. It is giving to the people of the locality of San Francisco the right to use a cheap power when it is developed. * * * This proposition is to harness that power and to put it to public use, not to give it to a private corporation. Why do we want to develop water power? Will we give it to the public or to a private corporation?

"Here is an instance where we are going to give it directly to the people, if we pass the bill." Cong.Rec. vol. 51, p. 343.

Thus it must be inferred that section 6 was enacted to insure the direct distribution of water and power by the City to its inhabitants. The language of the section makes it clear that no private corporation was to enjoy any profits from the government grant, which was to be enjoyed in its entirety by the consumers.

### Secondary Defenses.

Before approaching the chief issue in the case, the court will give its attention to what has been previously characterized as the City's secondary defenses. The basis for all of these defenses is the City's contention that the provision in section 6 which is alleged to be violated is not to be viewed as a valid and enforceable law but is at most a covenant dependent for its enforcement on the same principles of law and equity as are applicable to a similar covenant between private parties. The government asserts that the disputed section is a law, and entitled to the sanctity of a law. Since the effect of the City's secondary defenses hinges on the court's interpretation of section 6, the status of that section will be determined.

Congress does not have power to prescribe the regulations for the sale of electricity by a municipality. From this premise, the City argues that section 6 of the Raker Act is not a law but is a simple contract between the grantor and the grantee. To the Government's contention that the act is a law in its entirety S. F. replies that the conditions imposed in the grant are set up by the Government acting in a proprietary rather than a sovereign capacity and that as to these conditions the Government is in the same position as a private person, who would make the same sort of contract.

■ This line of reasoning is not sound. The fact that the federal government may lack the power to impose direct police regulations does not mean that any regulatory measure which is passed as an integral part of a valid piece of legislation cannot be enforced except as a simple contract. One part of a statute is as much a law as is any other part of the enactment. If Congress has the power to include a policing condition in a grant, then that condition is entitled to the full force of the law. Oregon & Cal. R. Co. v. U. S., supra; Wisconsin Cent. R. Co. v. Forsythe, 1895, 159 U.S. 46, 55, 15 S.Ct. 1020, 40 L.Ed. 71; Missouri, etc., R. Co. v. Kansas, etc., Ry. Co., 1878, 97 U.S. 491, 497, 24 L.Ed. 1095; Schulenberg v. Harriman, 1874, 21 Wall. 44, 62, 22 L.Ed. 551, and numerous other authorities hold that a granting act is a unified *law* as well as a grant. It is not subject to partition to suit the whims of the grantee.

■ Authority for a conditional grant of federal lands is found in article 4, § 3, cl. 2, of the Constitution, which reads: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

The following language from Light v. U. S., 1911, 220 U.S. 523, at pages 536 and 537, 31 S.Ct. 485, 488, 55 L.Ed. 570, indicates the scope of the rule-making power of Congress, as expressed by the Supreme Court:

"The United States can prohibit absolutely or fix the terms on which its prop-

erty may be used. As it can withhold or reserve the land, it can do so indefinitely. * * * It is true that the 'United States do not and cannot hold property as a monarch may, for private or personal purposes.' * * * But that does not lead to the conclusion that it is without the rights incident to ownership, for the Constitution declares, § 3, art. 4, that 'Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or the property belonging to the United States.' 'The full scope of this paragraph has never been definitely settled. Primarily, at least, it is a grant of power to the United States of control over its property.' * * *

" 'All the public lands of the nation are held in trust for the people of the whole country.' * * * 'And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.' "

To the same effect are Utah Power & Light Company v. U.S., 1917, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791, and Ruddy v. Rossi, 1918, 248 U.S. 104, 39 S.Ct. 46, 63 L.Ed. 148, 8 A.L.R. 843.

In the Hetch Hetchy grant, there is an enactment of what Congress deemed to be "needful rules and regulations" for the administration of federal lands granted to the City and County of San Francisco. It should be clear that the Government has power to make such rules and impose such conditions in conjunction with grants of its lands, and that those rules take on the force of law when the grant in which they are contained is itself made by Congress acting in its lawmaking capacity. Such is the situation in the case at bar. The limitation on the distribution of electric energy was within the lawmaking power of Congress, since it was directly connected with a grant of federal lands (article 4, § 3). The collateral nature of the condition—distribution of electricity over the lands—is well within the land disposal power of Congress. Ruddy v. Rossi, supra.[5]

A careful reading of the above-quoted clause of the Constitution, and a review of the cases governed by it lead the court to hold that Congress has express power to impose the condition which is set forth in section 6. If S. F. wished to enjoy the benefits of the grant, it was compelled to assume the burdens, however onerous they may have been.

The law in the case of Oregon & Cal. R. Co. v. U. S. supra, is generally applicable to the present situation. Because that case effectively disposes of the City's secondary defenses, the court will summarize the opinion, and quote freely from the language used by Mr. Justice McKenna:

By amendatory acts of Congress in 1869 and 1870, certain public lands were granted to railroad companies, subject to numerous conditions touching upon the use and disposal of the lands granted.[6] For some time the railroads complied with the requirements contained in the grants. But afterwards the conditions imposed by the Government were openly violated. Such conduct, persisted in over a period of years, finally led to a suit whereby forfeiture was sought by the United States Government, or, in the alternative, an injunction against further violation of the grants.

After concluding that the restrictions in the grants were not conditions subsequent which entitled the Government to forfeiture, but that they were enforceable covenants, the court ruled that *neither estoppel, waiver, reasonableness, nor any other equitable argument, merited consideration in view of the fact that a law was involved.*[7] In showing that the right to equitable relief does not require the plaintiff to prove damages in such an action, the court said, 238 U.S. 393, at page 422, 35 S.Ct. 908, 920, 59 L.Ed. 1360: "The language of the grants and of the limitations upon them is general. We cannot attach exceptions to it. The evil of an attempt is manifest. The grants must be taken as they were given. Assent to them was required and made, and we cannot import a different measure of the requirement and the assent than the language of the act expresses. It is to be remembered the *acts*

---

[5] In this case, lien limitations, placed on complete strangers to lands patented by the Government, were sustained as valid conditions imposed by the Government in disposing of its lands. Such limitations obviously did not deal with the actual use of the lands patented.

[6] The disputed limitation in the Oregon Case was upon the alienation of the lands granted; the restriction in the principal case is upon the use of the lands. Both limitations are "needful rules" within the land disposal powers of Congress, despite their different purposes.

[7] It is to be noted that the various defenses in the Oregon Case and those in the principal case are almost identical.

*are laws as well as grants, and must be given the exactness of laws."* (Italics supplied.)

The argument was presented that the character of the lands was such that it was not possible for the railroads to comply with the conditions imposed in the grants. The court was not impressed by this defense, and said, 238 U.S. 393, on page 428, 35 S.Ct. 908, 922, 59 L.Ed. 1360: "The character of the lands furnished no excuse. It might have justified nonaction, but it did not justify antagonistic action."[8] The conditions in the land grants were then found to be enforceable and the railroads were enjoined from further violation of them.

The above summary shows that the Oregon decision is controlling in the principal case on the secondary issues raised by the City.[9] The defenses set up by S. F., except for the nature of the contract itself, are immaterial because, as Mr. Justice McKenna said in the Oregon Case, 238 U.S. 393, at page 435, 35 S.Ct. 908, 925, 59 L.Ed. 1360: "Judgment is independent of them. It is determined by the simple words of the acts of Congress, not only regarded as grants, but as laws, and accepted as both; granting rights, but imposing obligations,—rights quite definite, obligations as much so. The first had the means of acquisition; the second, of performance; and, as we have pointed out, whatever the difficulties of performance, relief could have been applied for, and, it might be, have been secured, through an appeal to Congress. Certainly evasion of the laws or the defiance of them should not have been resorted to."

The Raker Act was passed by Congress acting in its lawmaking capacity. The enactment is a law in its entirety; therefore the court, in accordance with the ruling in the Oregon Case, must dismiss the secondary defenses relied upon by the City and turn to the agreement between the City and the Company to determine whether it is a contract for the sale of electricity for resale or a contract of agency whereby the City distributes its own power through an agent.

Nature of the Agreement between
the City and the Company.

The Government has alleged that the City is not distributing energy through the Company as an agent, but is selling electricity to it for resale in violation of section 6 of the Raker act. The City denies this allegation and contends that it has entered into an agency agreement whereby it distributes its own power.

How is the court to distinguish agency from sale? The intent of the parties, as shown by the language used in the instrument before the court, will be given weight in determining whether an agency relationship has been established. But the substance of a contract controls its construction despite any language of consignment which may be used. Greenough v. Willcox, 1927, 238 Mich. 52, 213 N.W. 175; Chezum v. Kreighbaum, 1892, 4 Wash. 680, 30 P. 1098, 32 P. 109; Standard Fashion Co. v. Magrane-Houston Co., 1921, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653; Straus v. Victor Talking Machine Co., 1917, 243 U.S. 490, 498, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955; Ex parte Flannagans, 1875, Fed.Cas.No. 4,855; Vermont Marble Co. v. Brow, 1895, 109 Cal. 236, 41 P. 1031, 50 Am.St.Rep. 37; 1 Mechem, Sales, § 46, p. 45; Restatement of Agency, § 1, b. The instrument must be dissected into its component parts, which, under close scrutiny, must reveal true agency. This method of analysis is recognized as proper in Marrinan, etc., Inc., v Fort Dodge Serum Co., 8 Cir., 1931, 47 F.2d 458, at page 460, where it is said by Judge Booth: "In recent times, the real or supposed needs and exigencies of business and the ingenuity of business men and of their lawyers have evolved a class of contracts which have the earmarks of both sale contracts and factorage contracts. It is not always easy to determine into which class a particular contract falls. If it becomes necessary to decide the question, all the court can do is to consider the various earmarks as disclosed by the contract, and the surrounding facts and circumstances, and determine, as best

---

[8] The "impossibility" defense of the City is answered by this statement.

[9] Considerable evidence was presented at the trial, subject to the Government's motion to strike, dealing with the secondary issues; other evidence on these same issues was excluded. In submitting the case, both sides have made motions with respect to this evidence—the Government, to strike it; the City, to reopen the case for the purpose of introducing the rejected evidence. The Oregon Case makes it clear that the court must grant the motion to strike and deny the motion to reopen.

it can, into which class the contract should be placed."

Mechem analyzes the essential characteristics of an agency to sell as follows: "The essence of agency to sell is the delivery of goods to a person who is to sell them, not as his own property but as the property of the principal, who remains the owner of the goods and who therefore has the right to control the sale, to fix the price and terms, to recall the goods, and to demand and receive their *proceeds* when sold, less the agent's commission, but who has no right to a *price* for them before sale or unless sold by the agent." 1 Mechem, Agency, 2d Ed., § 48, p. 30.

With these elements of agency before us, we shall consider the contentions of the Government and the City by asking the following questions:

(1) Who controls the product—the alleged principal or the agent?

(2) Who assumes the risk of loss?

(3) Upon what basis is payment to be made to the alleged principal?

(4) Who fixes the price and terms of sale?

(5) Who purchases the product?

(6) How are collections made from purchasers?

(7) What is done with the proceeds of sales?

(8) How does the alleged agent account to the principal?

(9) How does the alleged principal make its own purchases?

(10) When does the relationship terminate?

The answers to these questions will enable the court to decide what kind of agreement has been entered into by the City and the Company.

Under the contract, who controls the Hetch Hetchy electricity—the alleged principal or the agent? Hetch Hetchy power is to be delivered to the Company's Newark substation, where it becomes a part of the Company's energy. Thereafter control is entirely in the hands of the Company, whose load dispatcher directs the movements of the electricity after determining how much electricity will be accepted in the first instance. The City has no further interest in the power except the receipt of money for its delivery to the Company. Supervision rests in the load dispatcher. Such control by the Company points toward a sale, since agency is characterized by control being retained by the principal. Black v. Webb, 1851, 20 Ohio 304, 55 Am.Dec. 456; Restatement of Agency, § 1 and § 14b.

Does the alleged principal assume the risk of loss? Based on experience gained prior to 1925, distribution losses amounting to 24 per cent. of the energy delivered at Newark are to be deducted from the total delivered, and payment on such balance is to be 26.935 per cent. to the City and 73.065 per cent. to the Company of the average revenue to be derived from the sale of the power, such revenue amounting to 2.383 cents per kilowatt hour —computed on the rates of 1924. The deduction of 24 per cent. from the energy delivered at Newark, in fixing the amount due the City, is an attempt to place the risk of line losses on the City, as the principal. While it may be argued that this provision is at least indicative of agency, it is not unusual in sales contracts for the parties to require the seller to assume the risk. Furthermore, in the principal case, the deduction term may be present simply as a necessary factor in determining the correct price to be paid the City for its electricity.[10]

Upon what basis is payment of money collected from consumers of electricity to be made to S. F.? Under the written contract, proceeds from purchasers of electric power are to be paid on a proportional basis. The City alleges that proportional payment is normally found in agency agreements.[11] If this is so, and the instant contract set up an agency relationship, then a change in rates *would* cause a proportional change in the amounts received by the City and the Company. Actually, no

[10] It is worth noting that under the accounting system of the Company no risk of credit loss is placed on the City, although such risk is often found in agency relationships.

[11] The proportional payment basis does not preclude a sale from being consummated. This is made plain in the case of Public Utilities Commission v. Landon, 1918, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577, where a sale of gas was found under a contract by which the seller and the buyer were paid on a percentage basis. Although the Supreme Court did not discuss the agency question, it played an important role in the decision of the lower court and undoubtedly influenced the appellate body.

changes in revenue payments to the City have been made since 1925, despite several reductions in Company rates. The price paid S.F. has remained constant, despite the provision for proportional payment which is contained in the contract.

Conduct is entitled to the court's attention, especially when a written instrument is drafted in order to satisfy the requirements of a specific statute. If the price which S.F. receives under the contract is actually fixed, this is strong indication of a sale. In re Rabenau, D.C.1902, 118 F. 471; City of San Antonio v. Chas. M. Steiff, Inc., Tex.Civ.App.1935, 83 S.W.2d 357.

It has been argued by the City that increased consumption of electricity has tended to keep revenue almost constant, thus obviating the necessity for periodical adjustments; that is to say, consumption has increased directly and automatically with the lowering of rates. However, the failure of the Company to request changes in payments to the City, upon sizeable rate reductions and correspondingly reduced returns, is best explained by the theory that, before such lowering of rates, the Company was enjoying more than its contract share of the income received from consumers of electricity; that with the reduction of rates the Company received less than the sum to which it was entitled under the contract with the City, and thus, over a period of years, a close approximation to the contract percentages was maintained. But such compliance with the contract payment provisions—by averaging the returns to the City—does not spell agency. The fact that payments have remained constant since 1925 points toward a sale of electricity to the Company at a fixed price.

 If the Company would not be able to accept and distribute the power offered it, payment must none the less be made to the City on the basis of the energy which it *could* have delivered to Newark. Electricity is to be paid for on a 75 per cent. load factor basis regardless of actual sales to consumers. Duty to pay for a product whether it is accepted or used is normally found in a contract of sale. Swift & Co. v. Columbia, etc., Electric Co., 4 Cir., 1927, 17 F.2d 46, 51 A.L.R. 983, in which there was a duty to pay for electricity under a sale contract; no question of agency was involved. In re Sachs, D.C.1929, 31 F.2d 799; Ferry & Co. v. Hall, 1914, 188 Ala. 178, 66 So. 104, L.R.A.1917B, 620;

Coweta Fertilizer Co. v. Brown, 6 Cir., 1908, 163 F. 162; Peoria Mfg. Co. v. Lyons, 1894, 153 Ill. 427, 38 N.E. 661; 1 Mechem, Sales, § 43, p. 41. Such a duty is very rarely discoverable in an agency contract, except on an option basis. In re Thomas, D.C.1916, 231 F. 513. In fact, a provision in a contract by which the seller is assured of a payment for his goods, regardless of the buyer's ability to dispose of them, is so important in establishing a sale that the California Supreme Court, in the case of Los Angeles Gas & Electric Corp. v. Los Angeles, 1922, 188 Cal. 307, 205 P. 125, indicated that the difference between agency and sale might well hinge upon such a duty-to-pay requirement.

 In the Los Angeles Case, as in the S.F. controversy, a dispute arose over the distribution of electricity owned by the city. The Los Angeles charter forbade the sale of energy to a private company which intended to resell it. The city was transmitting its power over the facilities of two private companies. The agency contract under which the companies were operating was challenged. The question before the court, as in this case, was one of interpretation of an instrument to determine whether it gave rise to an agency or a sale contract. The court ruled that the contract was one of agency and that the city charter was not being violated. Of the numerous provisions which the court studied, no one alone convinced the judges that the contract was within the requirements of the charter. However, the absence of one provision—which is present in the case at bar and with which the court is now dealing—impressed the court enough to warrant the following dictum (188 Cal. 307, at page 316, 205 P. 125, 128): "It would seem that the determination as to whether or not the so-called operating agreement is in effect a sale of electrical energy at wholesale to the contracting companies, or is a method of distributing the power of the city to its consumers, would turn in part upon the question as to whether or not the return to the city would be regulated solely with reference to the quantity of power furnished by the city. If the contract was so arranged that the city would at all times receive a definite amount for the power furnished, regardless of the hazards of the business or the expenses of distribution, then it might be argued with some force that it was a sale

within the meaning of the charter prohibiting such a transaction."

The court has already pointed out that in the principal case the City was to receive a definite amount for Hetch Hetchy electricity, regardless of actual demand for the energy by the Company. The P.G.&E. has a duty to pay S.F. for electricity available at Newark, on the basis of a 75 per cent. load factor. That duty might not be fatal to an agency contract; but it deserves fully as much weight as the Los Angeles Case would give it.[12] In a normal agency, the agent effects a transfer and is not responsible for payment unless the commodity is actually delivered to him and sold by him.[13]

Who fixes the price at which electricity is to be sold to consumers? Rates to be charged consumers are not fixed by the City. They are expressly left in the hands of the State Railroad Commission. When prices are set by the one who disposes of the commodity, then the transaction is normally one of sale. In re Wayside Furniture Co., 7 Cir., 1933, 67 F.2d 201; City of San Antonio v. Chas. M. Stieff, supra; Chickering v. Bastress, 1889, 130 Ill. 206, 22 N.E. 542, 17 Am. St.Rep. 309. It is true that the Company does not fix rates, since it is a public utility whose schedule of charges is in the hands of the Railroad Commission. But the very fact that the Commission, instead of the City, fixes rates tends to exclude the possibility of agency. The Constitution of California (article III, § 23) declares that municipalities are not subject to commission regulation as are the private companies which serve as public utilities. If the P. G. & E. were acting as an agent on behalf of the City, then S.F. would be the proper party for fixing its own rates. The fact that the City does not set its rates is indicative of a sale. However, since the City does not furnish all the electricity which is supplied to S. F. consumers, it would not be possible for the City to fix charges for electricity supplied by it. Feasibility requires the present mode of rate fixing, notwithstanding the fact that a principal ordinarily sets the prices at which his agent will sell goods.

Who purchases the electricity? How are the purchasers billed? What is done with the proceeds from the sale of electricity? Electricity is to be disposed of by the Company to its usual customers, in the normal course of retail trade; customers are billed in the name of the Company, and money which is so collected from them is mingled with Company funds.

Disposal of goods to regular customers in the usual course of trade indicates a sale (Public Utilities Comm. v. Landon, 1918, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577), as does the billing of goods in the name of the retailer (except in an undisclosed agency). Commingling of funds collected from purchasers is characteristic of a sale. In re U. S. Electrical Supply Co., D.C.1924, 2 F.2d 378. To justify the mingling of funds, the City relies upon numerous grain cases. But a glance at these citations will show that they stand for the proposition that a mingling of goods is not considered irregular in many agency contracts. However, the grain broker, when serving as an agent, customarily keeps separate accounts for those with whom he transacts business. Of necessity certain products must be mingled, but the proceeds from their sale are placed in the different accounts of each contributor according to his prorata interest in the whole. Electricity, while

---

[12] Defendant, in presenting its agency arguments, placed much reliance on the Los Angeles decision. In addition to the duty-to-pay provision which is present in the S. F. case and absent from the Los Angeles contract, the two cases are further distinguishable. The contract between Los Angeles and the private companies provided that the city buy 25,000 horse power of electricity so that all energy in the lines would be owned by the city, and the companies would act solely in the capacity of distributing agents. Under the contract between S. F. and the Company, the power which the latter distributes is the City's electricity in part only. Because of the nature of electricity, it is almost essential that all energy be owned by the City if it would enter into an agency relationship. This will be explained by the court in its opinion.

[13] As a practical matter, S. F. has been able to utilize the full capacity of Hetch Hetchy power even during off-peak periods. Thus the Company has not been forced to pay for electricity which it has neither accepted nor sold. The written contract is inconsistent with an agency agreement, but the fulfillment of its duty-to-pay provision is not. As carried out, the 75 per cent. load factor term has meant that preference is given to Hetch Hetchy energy by the Company, when consumer demand is low.

different from grain, has been held to be personal property for legal purposes, and subject to the rules governing personal property. Terrace Water Co. v. San Antonio, etc., Co., 1905, 1 Cal.App. 511, 82 P. 562; Lothrop Theatres Co. v. Edison, etc., Co., 1935, 290 Mass. 189, 195 N.E. 305, 307. Thus the funds collected from S. F. consumers would be kept separate were this an agency contract. But again, the nature of the product makes this separation impossible, except on an arbitrary basis.

Does the Company submit a record of its electric sales to consumers, to the City at the end of each month? No accounting is made to the City, which simply bills the Company for electricity transmitted to Newark. The accounting procedure is limited to the delivery by the City to the Company, although in an agency relationship the agent accounts to the principal. Of course, where information is available to the principal, there is no real need for an accounting. In the case at bar the City can obtain considerable statistical information, by requesting a monthly report from the local utilities commission. But such report would not disclose the per cent. of S. F. electricity sold to the public, for the nature of the product prevents such a record from being kept.

■ What is the arrangement for the purchase of electricity by the alleged principal from the agent? The City itself purchases electricity from the Company just as any other customer does. Yet purchases by the principal from the agent are very uncommon in agency contracts; they are inconsistent with an agency interpretation; instead they constitute proof of sale.

When does the relationship between the City and the Company end? The contract between the City and the Company is terminable upon one day's notice by either party, or upon request of the Secretary of the Interior, if he should find that it violates the Raker Act. Such a cancellation provision may be indicative of agency. In re Galt, 7 Cir., 1903, 120 F. 64. But it is of only slight significance in the S. F. case because an important reason for the one-day provision is made manifest by the second ground upon which cancellation may be brought about, namely, a violation of the Raker Act.

■ The following review of the analysis which has been completed will show that the agreement between the City and the Company is clearly one for the sale of electricity:

(1) Control of Hetch Hetchy power is in the hands of the Company from the moment that City electricity enters the Company lines at Newark.

(2) The price which S. F. receives for its Hetch Hetchy power has remained fixed, despite fluctuations in Company income.

(3) The 24 per cent. deduction of electric energy from the amount of Hetch Hetchy power delivered at Newark—based on line losses of electricity between Newark and S. F.—is a factor considered in ascertaining a fair price for the sale of electricity by the City to the Company.

(4) There is a duty imposed upon the Company to pay for Hetch Hetchy power on a 75 per cent. load factor basis, regardless of Company needs.

(5) Rates to be charged consumers of Hetch Hetchy power are not fixed by the City.

(6) Hetch Hetchy power is disposed of by the Company to its usual customers in the normal course of business.

(7) Consumers of Hetch Hetchy power are billed in the Company name.

(8) Accounting between the City and the Company is limited to S. F.'s billing the P. G. & E. for Hetch Hetchy power delivered at Newark each month.

(9) The City is itself a purchaser of Hetch Hetchy power from the Company.

(10) The Secretary of the Interior may request a cancellation of the contract, should he find it to be in violation of section 6 of the Raker Act.

There is no clear-cut line which divides sales contracts from agency agreements. If the earmarks of sale predominate, then a sales contract exists. The fact that individual sales provisions may be explained away, on the ground that their presence has been tolerated by courts which have found them in agency relationships, does not lend weight to an agency interpretation; and, when such sales provisions appear together, they are strong proof of a sale. In the principal case the elements of sale compel the court to declare the contract to be one of sale, with title to the electricity passing to the Company at Newark. Viewed in the light of the history of the Raker Act, the present arrangement is seen to comply neither with the letter nor the spirit of the federal grant by means of which S. F. was

52

enabled to construct the Hetch Hetchy project.

The nature of the product is one explanation for the kind of contract which was entered into by the City and the Company, and also for the Government's contention that even an agency agreement might be beyond the limitations imposed by section 6 of the Raker Act. Electricity has been defined in Webster's 1937 dictionary as "an imponderable and invisible agent producing light, heat, chemical decomposition, and other physical phenomena." This unknown agent has been declared to be personal property for legal purposes; but it is a peculiar kind of property which cannot be stored in sizeable quantities and cannot be allocated on a prorate basis when a commingling occurs. Because of its mysterious character, and the difficulty of handling it through agency facilities, any contract which deals with its disposal under a *pooling* arrangement must necessarily contain numerous elements which are usually found in sales contracts. These elements may not entirely preclude an agency relationship; yet, when combined with fundamental sales provisions, they make the agency relationship extremely improbable. If all the electricity supplied to the inhabitants of a municipality should be owned by the municipality, an agency relationship for the distribution of electric energy might be set up, without perverting the meaning of the word "agency"; but, where only some of the electricity is. furnished by the municipality, it is doubtful whether a true agency contract could be drafted.

### Arguments as to Construction of Contract.

The City, in addition to submitting its own reasons for interpreting the contract with the Company as one of agency, has suggested that the construction placed upon the instrument by several federal officers is controlling. It is alleged by S. F. that responsible government officials have already passed upon the contract; that they have indicated that it is an agency agreement; that their contemporaneous opinions are entitled to the respect of the court.[14]

 It is true that the contemporaneous construction of a contract by government officials must be given weight in determining its nature. But the doctrine of contemporaneous construction relied upon by the City refers to the construction of the instrument which must be administered by government officers, and not to some other document, such as the contract in the principal case. This is made plain by defendant's own quotation from 59 Corpus Juris 1025, § 609: "The contemporaneous construction placed upon a statute by the officers or departments charged with the duty of executing it, is entitled to more or less weight, especially if such construction has been made by the highest officers in the executive department of the government."

Thus it is apparent that the opinion of the Secretary of the Interior must be given due regard when it is applied to the Raker Act. But the Secretary's views about a private contract are not entitled to the same consideration, even though an interpretation of that contract is necessary in order to invoke the statute. If, however, the court should treat the contract between the City and the Company as so closely related to the Raker Act as to apply—by analogy—the rule that an interpretation of a statute by a department head must be given great weight (U. S. v. Jackson, 1930, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361; Bates & Guild Co. v. Payne, 1904, 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894; People v. Southern P. Co., 1930, 209 Cal. 578, 290 P. 25), then what may be learned about the agreement before the court?

 Shortly after the controversial contract was put into effect, the instrument was shown to the then Secretary of the Interior. No complaint was registered by the Secretary after his examination of the document. Yet it cannot be said that his silence amounted to an express sanction of its provisions. His negative behavior might be an indication, at best, that he considered the contract a temporary stop-gap until such a time as the City would be able to acquire its own distributing system. Neither the Secretary in 1925 nor his immediate successors made a serious effort to interpret the contract for purposes of challenging it or approving it, for all of them expected the City to fulfill its obligations under the Raker Act. In 1934 for the first time an exhaustive study of the contract was made by the incumbent Secretary, Ickes, and he concluded that it resulted in a violation of section 6 of the Raker Act. The opinions of

---

14 The contemporaneous construction argument was also presented in support of the City's estoppel defense, which the court has disposed of under the doctrine of the Oregon Case.

the prior Secretaries were seldom expressed. When statements were issued, as in the case of the Secretary in office in 1930, they were not favorable to the City's contentions (Transcript 127½, Defendant's Exhibit B). Toleration of the contract over a period of years does not lend much weight to an agency interpretation; the opinion of the now Secretary of the Interior supports a sales construction. The doctrine of contemporaneous construction thus fortifies the interpretation of the contract already made by the court.

■■■■ Where a valid law is enacted, there must be compliance with its provisions. An injunction is the proper remedy for compelling such compliance (Oregon & Cal. R. Co. v. U. S., supra), unless money damages will afford adequate relief (World's Columbian Exposition v. U. S., 7 Cir., 1893, 56 F. 654). The injury to the Government caused by the City's violation of the Raker Act cannot be measured in terms of money damages. Therefore S. F. must observe the conditions in the Raker Act. If a law is unworkable, it should not be circumvented by those whom it binds; rather an effort should be made to have the law amended by the Congress. The Raker Act is a valid law, the provisions of which S. F. must obey. A violation of this law the court must enjoin regardless of the reason for the violation. Oregon & Cal. R. Co. v. U. S., supra. Section 6 does not permit a sale of electricity to a private corporation for purposes of resale. The Raker Act is not being complied with by S. F. Under these circumstances, the court holds that the Government is entitled to an injunction directing the City to cease its present disposal of electric power or be restrained from using the rights granted by the Raker Act for the generation and transmission of such power.

■ Such injunction, however, will not be made immediately operative. At present S. F. is collecting in excess of $2,000,000 per year from the Company; there has been intimation that the Hetch Hetchy power is a necessary augmentation of the Company's system; the City has been operating under the contract with the Company for almost thirteen years; a sudden disruption of operations would result in serious economic waste. These factors weigh heavily with the court. In order that the City may face its problem and comply with its obligations under section 6 of the Raker Act, the court will make its injunction issuable forthwith, but effective six months from the date of its issue.

The opinion may stand in lieu of the written findings of fact and conclusions of law. Each party is to pay its own costs.