RUDDY *v.* ROSSI.

ERROR TO THE SUPREME COURT OF THE STATE OF IDAHO.

No. 17. Submitted November 13, 1918.—Decided December 9, 1918.

Section 4 of the Homestead Act of May 20, 1862, (§ 2296, Rev. Stats.), providing that no lands acquired under the act shall in any event become liable to the satisfaction of any debt contracted prior to the issuance of patent therefor, applies as well to debts contracted after final entry and before patent as to debts contracted before final proof, and in both respects is within the constitutional power of Congress.

28 Idaho, 376, reversed.

THE case is stated in the opinion.

*Mr. Charles E. Miller* for plaintiff in error. *Mr. A. H. Featherstone* was also on the brief:

The jurisdiction of the Interior Department respecting a homestead entry is not divested until the patent is issued. [Citing Land Decisions.]

The doctrine of relation is inapplicable in the construction of the statute. Debts contracted after final entry but before patent are within the intention no less than the clear letter. *Wallowa National Bank* v. *Riley,* 29 Oregon, 289; *Watson* v. *Voorhees,* 14 Kansas, 254; *Doran* v. *Kennedy,* 237 U. S. 362; *Hussman* v. *Durham,* 165 U. S. 144; *(cf. Leonard* v. *Ross.* 23 Kansas, 292);

*Seymour* v. *Sanders,* 3 Dill. 437; *Brun* v. *Mann,* 151 Fed. Rep. 145; *In re Kohn,* 171 Fed. Rep. 570; *In re Parmeter's Estate,* 211 Fed. Rep. 757; *Grames* v. *Consolidated Timber Co.,* 215 Fed. Rep. 785.

Numerous decisions by the Supreme Courts of Arizona, Arkansas, California, Minnesota, Missouri, Nebraska, Oregon, South Dakota, Washington and Wisconsin reach the same conclusion.

No appearance for defendant in error.

Mr. Justice McReynolds delivered the opinion of the court.

By "An act to secure homesteads to actual settlers on the public domain," approved May 20, 1862, c. 75, 12 Stat. 392, Congress prescribed the conditions under which citizens could acquire unappropriated public lands in tracts of not exceeding one hundred and sixty acres. A manifest purpose was to induce settlement upon and cultivation of these lands by those who, five years after proper entry, would become owners in fee through issuance of patents. The great end in view was to convert waste places into permanent homes. Such occupancy and use constituted a most important consideration and were rightly expected to yield larger public benefits than the small required payment of one dollar and a quarter per acre.

Decision of this cause requires us to consider the meaning and validity of § 4 of the act (Rev. Stats., § 2296) which provides: "No lands acquired under the provisions of this act shall in any event become liable to the satisfaction of any debt or debts contracted prior to the issuing of the patent therefor."

Plaintiff in error made preliminary homestead entry of designated land within the State of Idaho August 6, 1903; submitted final proofs October 4, 1909; obtained

final receipt and certificate November 12, 1909; final patent issued August 26, 1912. In 1914 two judgments were obtained against him; the first upon indebtedness incurred prior to November 12, 1909; the second upon debts contracted subsequent to that date and prior to patent. Executions were issued and levied upon the homestead; and thereupon the proceeding under review was begun to declare asserted liens invalid and a cloud upon the title. The court below held the first judgment unenforceable against the land since it represented indebtedness which accrued prior to final entry. It further held the second judgment could be so enforced as it was based upon debts contracted after final entry, at which time the homesteader became legally entitled to his patent. 28 Idaho, 376.

The language of § 4 is clear and we find no adequate reason for thinking that it fails precisely to express the law-maker's intention.

Did Congress have power to restrict alienation of homestead lands after conveyance by the United States in fee simple? This question undoubtedly presents difficulties which we are not disposed to minimize. In *Wright* v. *Morgan*, 191 U. S. 55, 58, a similar point was suggested but not decided.

The Constitution declares "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States"; and it is settled that Congress has plenary power to dispose of public lands. *United States* v. *Gratiot*, 14 Pet. 526, 537. They may be leased, sold or given away upon such terms and conditions as the public interests require. Instead of granting fee simple titles with exemption from certain debts, long leases might have been made or conditional titles bestowed in such fashion as practically to protect homesteads from all indebtedness.

"The sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." *McCulloch* v. *Maryland*, 4 Wheat. 316, 421.

Acting within its discretion, Congress determined that in order promptly to dispose of public lands and bring about their permanent occupation and development it was proper to create the designated exemption; and we are unable to say that the conclusion was ill-founded or that the means were either prohibited or not appropriate to the adequate performance of the high duties which the legislature owed to the public.

The judgment of the court below must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE HOLMES:

This case involves a question of theory that may be important and I think it desirable to state the considerations that make me doubt. The facts needing to be mentioned are few. On August 26, 1912, the United States conveyed land in Idaho to Ruddy in fee simple, in pursuance of a homestead entry by Ruddy on August 6, 1903, final proof on October 4, 1909, and final receipt of the purchase price on November 12, 1909. In September, 1912, after the conveyance, Rossi began suits against Ruddy, attaching this land, and in June, 1914, levied executions upon the same. The debts for which the

suits were brought were incurred before the issue of the
patent and the present proceeding is to prevent Rossi
from selling the land to satisfy the judgments. The ques-
tion arises under Rev. Stats., § 2296, providing that no
lands acquired under that chapter shall in any event
become liable to the satisfaction of any debt contracted
prior to the issuing of the patent therefor. The Supreme
Court of Idaho narrowed the issue to the case of debts
contracted after final proof, but that distinction is not
important to the difficulty in my mind.

My question is this: When land has left the ownership
and control of the United States and is part of the territory
of a State not different from any other privately owned
land within the jurisdiction and no more subject to leg-
islation on the part of the United States than any other
land, on what ground is a previous law of Congress sup-
posed any longer to affect it in a way that a subsequent
one could not? This land was levied upon not on the
assertion that any lien upon it was acquired before the
title passed from the United States, but merely as any
other land might be attached for a debt that Rossi had a
right to collect, after the United States had left the prem-
ises. I ask myself what the United States has to do with
that. There is no condition, no reserved right of reëntry,
no reversion in the United States, saved either under
the Idaho law as any private grantor might save it, or
by virtue of antecedent title. All interest of the United
States as owner is at an end. It is a stranger to the title.
Even in case of an escheat the land would not go to it,
but would go to the State. Therefore the statute must
operate, if at all, purely by way of legislation, not as a
qualification of the grant. If § 2296 is construed to
apply to this case, there is simply the naked assumption
of one sovereignty to impose its will after whatever juris-
diction or authority it had has ceased and the land has
come fully under the jurisdiction of what for this purpose

is a different power. It is a pure attempt to regulate the alienability of land in Idaho by law, without regard to the will of Idaho, which we must assume on this record to authorize the levy if it is not prevented by an act of Congress occupying a paramount place.

I believe that this Court never has gone farther in the way of sustaining legislation concerning land within a State than to uphold a law forbidding the enclosure of public lands, which little, if at all, exceeded the rights of a private owner, although it was construed to prevent the erection of fences upon the defendants' own property manifestly for the sole purpose of enclosing land of the United States. *Camfield* v. *United States*, 167 U. S. 518. At most it was a protection of the present interests of the United States under a title paramount to the State. On the other hand, it is said in *Pollard* v. *Hagan*, 3 How. 212, 224, that no power in the nature of municipal sovereignty can be exercised by the United States within a State; that such a power is repugnant to the Constitution. This case was referred to in *Withers* v. *Buckley*, 20 How. 84, and it was decided that the act of Congress authorizing the formation of the State of Mississippi and providing that the Mississippi River should be forever free "could have no effect to restrict the new State in any of its necessary attributes as an independent sovereign government," and both these cases were cited upon this point with approval in *Ward* v. *Racehorse*, 163 U. S. 504, 511, 512. See also *Shively* v. *Bowlby*, 152 U. S. 1, 27. In *Irvine* v. *Marshall*, 20 How. 558, where it was held that the laws of a territory abolishing constructive trusts were ineffectual to protect the holder of a certificate from the United States against the establishment of such a trust, it was said that "when the subject, and all control over it, shall have passed from the United States, and have become vested in a citizen or resident of the territory, then indeed the territorial regulations may operate upon it," and

later in the decision there is cited a passage from *Wilcox* v. *Jackson*, 13 Pet. 498, 517, to the same effect—a passage also cited and relied upon by the four justices who dissented and held that the territorial laws governed even then. It has been repeated ever since. *McCune* v. *Essig*, 199 U. S. 382, 390. *Buchser* v. *Buchser*, 231 U. S. 157, 161.

Coming to the precise issue, the question of the power of the United States to restrict alienation of land within a State after it had conveyed the land in fee was left open in *Wright* v. *Morgan*, 191 U. S. 55, 58, but it was said that the clearest expression would be necessary before it would be admitted that such a restriction was imposed. In *Buchser* v. *Buchser*, 231 U. S. 157, it was held that the laws of the United States did not prevent homestead land becoming community property at the moment that title was acquired, and it was said that, the acquisition under the United States law being complete, that law had released its control. The statement in *Wilcox* v. *Jackson*, *supra*, that when the title has passed the land "like all other property in the State is subject to the state legislation," was repeated. In *Alabama* v. *Schmidt*, 232 U. S. 168, following *Cooper* v. *Roberts*, 18 How. 173, it was held that land conveyed to the State by the United States for the use of schools could be acquired by adverse possession under state law, and that the trust, although as was said in the earlier case "a sacred obligation imposed on its public faith" imposed only an honorary obligation on the State. *Northern Pacific Ry. Co.* v. *Townsend*, 190 U. S. 267, was distinguished as having been decided on the ground that in the grant to the Railway there was an implied condition of reverter in case the company ceased to hold the land for the purpose for which it was granted, a ground, which, as I have said, is absent here.

It is said that where a statute is susceptible of two constructions, by one of which grave constitutional

questions arise and by the other of which they are avoided, our duty is to adopt the latter. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408. I am aware that this principle like some others more often is invoked in aid of a conclusion reached on other grounds than made itself the basis of decision, but it seems to me that it properly should govern here. It might without violence. When the Act of 1862, now Rev. Stats., § 2296, was passed, the United States owned territories to which it could be applied with full scope. *Irvine* v. *Marshall*, 20 How. 558. The greater part of the public land was in those territories. Without stopping to suggest other possibilities of construction this fact is enough to explain and give validity to the act when passed. There is no need to import to it the intent to anticipate the future and to reach the States that were still in the bosom of time.

Of course the United States has power to choose appropriate means for exercising the authority given to it by the Constitution. But I see no sufficient ground for extending that authority to a case like this. It is not the business of the United States to determine the policy to be pursued concerning privately owned land within a State. According to all cases in this Court, so far as I know, when the patent issued its authority was at an end.

I am aware that my doubts are contrary to manifest destiny and to a number of decisions in the State Courts. I know also that when common understanding and practice have established a way it is a waste of time to wander in bypaths of logic. But as I have a real difficulty in understanding how the congressional restriction is held to govern this case—a question which nothing that have heard as yet appears to me to answer—I think it worth while to mention my misgivings, if only to show that they have been considered and are not shared.