EMMA HARVEY,
ADMINISTRATRIX OF THE ESTATE OF ETTA E. COVEL

*vs.*

MARGARET A. RACKLIFFE,
ADMINISTRATRIX OF THE ESTATE OF WILLIAM A. GRIFFIN.

Knox.　Opinion, February 21, 1945.

*Jerome C. Burrows,* for the appellant.

*Frank F. Harding,* for the appellee.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MUR-CHIE, CHAPMAN, JJ.

THAXTER, J. This case is before us on report from the Supreme Court of Probate for the County of Knox. It is an

appeal by the administratrix of the estate of Etta E. Covel from a decree of the Judge of Probate of that county, which determined that the sum of $888.75, representing the proceeds in her hands as such administratrix from the cashing of certain United States War Bonds, belonged not to her but to the administratrix of the estate of William A. Griffin. The United States of America, because of the importance to it of the issue involved, has filed a brief as *amicus curiae*. The facts are not in dispute.

William A. Griffin purchased with his own money United States War Bonds having a maturity value of $1,125. In accordance with United States Treasury Department Regulations Circular No. 530, the applicable provisions of which are Sections 315.1, 315.2, 315.4(c), 315.8, 315.34, 315.35, 315.36, and 315.37, these bonds were registered in the so-called beneficiary form in the name of William A. Griffin payable on death to Etta E. Covel. The essential part of the statute authorizing their issuance reads as follows:

"The Secretary of the Treasury, with the approval of the President, is authorized to issue, from time to time, through the Postal Service or otherwise, United States savings bonds and United States Treasury savings certificates, the proceeds of which shall be available to meet any public expenditures authorized by law, and to retire any outstanding obligations of the United States bearing interest or issued on a discount basis. The various issues and series of the savings bonds and the savings certificates shall be in such forms, shall be offered in such amounts, subject to the limitation imposed by section 757b of this title, and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b), (c), and (d) hereof, and including any restrictions on their transfer, as the Secretary of the Treasury may

from time to time prescribe." (Section 22 of the second Liberty Bond Act, added by the Act of February 4, 1935, 49 Stat. 21, Title 31, U. S. C., 1940 ed., Sec. 757c, as amended by the Public Debt Act of 1941, Act of February 19, 1941, 55 Stat. 7, Title 31, U. S. C., 1940 ed., Sup. 1, Sec. 757c).

The regulations provide in part that the form of registration "will be considered as conclusive of such ownership and interest"; that the bonds "are not transferable and are payable only to the owners named"; that they may not be sold or hypothecated; that they may be paid to the registered owner during his lifetime; that after his death the beneficiary if surviving will be recognized as "the sole and absolute owner"; and that after the death of the surviving beneficiary the bond may be paid or reissued in accordance with the regulations "as though it were registered in the name of the surviving beneficiary alone."

No contention is made, nor could any validly be made, that these regulations are not a proper exercise of the power given to the Secretary of the Treasury by the Congress; and they accordingly have the force and effect of Federal law. Cases involving this and analogous situations have consistently so held. *Maryland Casualty Co.* v. *United States,* 251, U. S., 342, 64 L. Ed., 297, 40 S. Ct., 155; *United States* v. *Sacks,* 257 U. S., 37, 66 L. Ed., 118, 42 S. Ct., 38; *United States* v. *Janowitz* 257 U. S., 42, 66 L. Ed., 120, 42 S. Ct., 40; *United States* v. *Grimaud,* 220 U. S., 506, 55 L. Ed., 563, 31 S. Ct., 480; *Hampton* v. *United States,* 276 U. S., 394, 72 L. Ed., 624, 48 S. Ct., 348; *Bowles* v. *Willingham,* 321 U. S., 503, 88 L. Ed., 892, 64 S. Ct., 641.

After the death of Mr. Griffin, Mrs. Covel, the beneficiary owner, died; and the bonds came into the possession of the appellant as her administratrix who, in accordance with the

treasury regulations, cashed them. The controversy is between the two estates as to the title to the proceeds. The Judge of Probate has ruled that the money belongs to the administratrix of the estate of Mr. Griffin.

Her contention is that the case of *Garland, Appellant,* 126 Me., 84, 136 A., 459, is controlling. This holds that a bank deposit payable to either of two persons or the survivor does not by reason of its form belong to the survivor, the question being to whom did the money, represented by the deposit book, actually belong. If it was the money of the deceased and he reserved a right of control over it in his lifetime, it was the property of his estate after his death. For to hold otherwise would be to sustain a gift intended to take effect after death in violation of the Statute of Wills.

The appellant and the United States claim that the *Garland* case is not controlling; that there is here a contract by which the United States agreed to pay this money to the survivor; that the performance of that contract according to its terms is one of the essential functions on which the ability of the Federal Government to borrow money on a reasonable basis depends; and that no state law can stand in the way of the fulfillment of that obligation both in accordance with its letter and its spirit.

At the outset our attention is called to the provisions of the Federal constitution giving to Congress the power "to borrow Money on the credit of the United States", Art 1, Sec. 8, Clause 2, and "to make all Laws which shall be necessary and proper for carrying into Execution" this power, Art. 1, Sec. 8 Clause 18; and particularly we are directed to Art. VI, Clause 2, which provides that:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges

in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

This supremacy of Federal law has been established by numerous decisions.

In *M'Culloch* v. *Maryland,* 4 Wheat., 316, 4 L. Ed., 579, Chief Justice Marshall laid down the principle that a State has no power to tax a branch of the Bank of the United States. He said, page 427, L. Ed., page 606:

". . . the sovereignty of the state, in the article of taxation itself, is subordinate to, and may be controlled by the constitution of the United States. How far it has been controlled by that instrument must be a question of construction. In making this construction, no principle not declared can be admissible, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operations from their own influence."

In *Weston* v. *City Council of Charleston,* 2 Pet., 449, 7 L. Ed., 481, the same Chief Justice amplified this principle in language which is peculiarly applicable at the present time and to the case now before us. He said, pages 465, 467, L. Ed., pages 487, 488:

"Congress has power 'to borrow money on the credit of the United States.' The stock it issues is the evidence of a debt created by the exercise of this power. The tax in question is a tax upon the contract, subsisting between the government and the individual.

It bears directly upon that contract, while subsisting and in full force. The power operates upon the contract the instant it is framed, and must imply a right to affect that contract."

\* \* \*

"A contract made by the government in the exercise of its power, to borrow money on the credit of the United States, is undoubtedly independent of the will of any State in which the individual who lends may reside, and is undoubtedly an operation essential to the important objects for which the government was created."

In *Irvine* v. *Marshall*, 20 How., 558, 15 L. Ed., 994, there was involved a Minnesota statute which provided that no trust should result where, with the consent of the true owner, title to land should be taken in the name of another. In refusing to recognize the statute in so far as the title to land bought of the Federal Government was involved, the Court said:

"Another error . . . is seen in the supposition that the contracts of the government with respect to subjects within its constitutional competency are also local, confined in their effect and operation strictly to the *situs* of the subjects to which they relate. The true principle applicable to the objection just noted, and by which that objection is at once obviated, we hold to be this: That within the provisions prescribed by the Constitution, and by the laws enacted in accordance with the Constitution, the Acts and powers of the Government are to be interpreted and applied so as to create and maintain a system, general, equal, and beneficial as a whole. By this rule, the Acts and the contracts of the Government must be under-

stood as referring to and sustaining the rights and interests of all the members of this Confederacy, and as neither emanating from, nor intended for the promotion of, any policy peculiarly local, nor in any respect dependent upon such policy."

In the application of these general principles to the specific problem now before us, the cases have not been uniform, but the strong weight of authority, particularly of the more recent cases, is to sustain the principle claimed by the government and by the appellant in the instant case. Washington and Iowa have refused to follow it, and there is one decision in New York to the same effect. *Decker* v. *Fowler*, 199 Wash., 549, 92 Pac. (2d), 254, 131 A. L. R., 961; *Sinift* v. *Sinift*, 229 Iowa, 56, 293, N. W., 841; *Deyo* v. *Adams*, 36 N. Y. S. (2d), 734.

In the Washington case, decided in 1939, there was a strong dissenting opinion; and it is important to note that the majority opinion proceeds on the assumption that there was no claim by the Federal government that the Federal law was supreme. The Court held that the provisions of the regulations were for the convenience of the Federal government which was not concerned with the question of "to whom the money might belong after it was paid."

In the Iowa case, decided in 1940, we find substantially the same interpretation of the Treasury Regulations as was adopted by the Washington Court. It is held that they were promulgated solely for the convenience of the government and to protect it in making payment to one who might not in fact be the owner.

In the New York case the Court placed the same interpretation on the Treasury Regulations, but the government did not appear to claim that such interpretation was not warranted. The decision did not involve a hearing on the merits but went only to the sufficiency of the complaint. The deci-

sion was followed in *In re Karlinski's Estate*, 38 N. Y. S. (2d), 297, 40 N. Y. S. (2d), 22, 43 N. Y. S. (2d), 40. However, before a decree was signed the United States asked to intervene. In granting the petition, the Surrogate said: "If it convinces me of the tenability of its position, namely, that the United States Government in the exercise of its power to borrow money through the sale of War Bonds is not subject to the law of the State of New York governing the disposition and distribution of the property of deceased persons, I will not hesitate to change my decision." *In re Deyo's Estate*, 42 N. Y. S. (2d), 379, was a hearing on the merits of the complaint which had been sustained in the earlier decision. The Surrogate, however, refused to adopt the principle there laid down. He referred to the fact that the preceding decision had been severely criticized, and then in an exhaustive opinion, holding that the Federal law was supreme, sustained the right of the surviving beneficiary. This decision was followed *In re Hager's Estate*, 45 N. Y. S. (2d), 468. In *Deyo v. Adams*, 48 N. Y. S. (2d), 419, the Court held that the decision in the first *Deyo* case, which sustained the complaint, was the "law of the case" and must stand until it should be reviewed by the Appellate Division which, it was conceded, might adopt a different rule. While this case was thus finding its way through the different courts, the New York Legislature settled the question in so far as future cases were concerned by the passage of a statute, L. 1943, Ch. 632, which provided that the right of the owner, co-owner or beneficiary of such United States savings bonds, to receive payment of the same "shall not be defeated or impaired by any statute or rule of law governing transfer of property by will or gift or an intestacy . . . ." This bill was passed according to a legislative note annexed to it, to remove doubt resulting from the original *Deyo* decision and to "assure purchasers of such bonds that the persons designated by them as payees will receive the money." Leg. Doc. (1943),

No. 65 (M), p. 3. In New York therefore the controversy is ended except in so far as the rights of the parties in the *Deyo* case may be concerned. We have not been informed whether or not that case has gone forward to the Appellate Division.

No case, other than these three rather unsatisfactory decisions, has been cited sustaining the position of the appellee in the case before us. On the other hand there are a number of carefully considered opinions which adopt a contrary view. *Warren, Executrix* v. *United States,* 68 C. Cls., 634 (1929); *United States* v. *Dauphin Deposit Trust Co.,* 50 Fed. Supp., 73 (Dist. Court Mid. Dis. Penn., 1943); *Franklin Washington Trust Co.* v. *Beltram,* 133 N. J., Eq., 11, 29 A. (2d), 854 (N. J. Ch. 1943); *Reynolds* v. *Danko,* 134 N. J., Eq., 560, 36 A. (2d), 420 (N. J. Ch. 1944); *Meyer* v. *Mercier,* 102 Colo., 422, 80 P. (2d), 332; *In re Di Santo's Estate* 142 Ohio St., 223, 51 N. E. (2d), 639 (Ch. 1943); *Conrad* v. *Conrad,* 152 P. (2d), 221 (Cal. App., 1944); *Mitchell* v. *Edds,* 181 S. W. (2d), 323 (Tex. Civ. App., 1944).

Generally speaking these cases are decided on the theory that there is here a contract with the United States for the benefit of a third person whose rights arise solely from the contract and in no sense by reason of a grant or gift; that this contract which gives the beneficiary a present, vested, though defeasible interest, is governed by Federal law and must be enforced in accordance with its letter and its spirit uniformly throughout the United States; and that no State statute or rule of law may stand in the way of such enforcement.

The exact question here at issue has not been decided by the Supreme Court of the United States but decisions in cases upholding the exercise of Federal powers leave but little doubt as to what the result will be if this issue is presented.

In *Ruddy* v. *Rossi,* 248, U. S., 104, 63 L. Ed., 148, 39 S. Ct.,

46, 8 A. L. R., 843, it was held that Congress had the power to exempt, to the extent prescribed by the Federal statute, homestead lands within a state from liability to satisfy debts of the homesteader.

*United States* v. *Janowitz*, 257 U. S., 42 66 L. Ed., 120, 42 S. Ct., 40, assumes without question the right of the Federal Government to impose restrictions on the transferability of its obligations.

*In Johnson* v. *Maryland*, 254 U. S., 51, 65 L. Ed., 126, 41 S. Ct., 16, the power of the State was denied to require an automobile driver's license of a government employee, while operating a truck over a state highway on government business.

In *Clearfield Trust Co.* v. *United States*, 318 U. S., 363, 87 L. Ed., 838, 63 S. Ct., 573, the question was as to the liability of a bank in cashing a government check, the endorsement of which was forged. "Under the law of Pennsylvania, where the transaction took place, prompt notice to endorsers by the drawee of the check after learning of the forgery was necessary to recover the amount paid to them." Under Federal law this was not required. In deciding that the contract was governed by Federal Law, the Court said, 318 U. S., page 367, 87 L. Ed., 842, 63 S. Ct., 575:

> "The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making indentical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain."

· Then there are the cases which, in order to maintain to the fullest extent the borrowing power of the Federal government, hold that a state may not impose a tax on bonds or other obligations of the United States. *Weston* v. *City Council of Charleston,* supra; *Farmers Bank* v. *State of Minnesota,* 232 U. S., 516, 58 L. Ed., 706, 34 S. Ct., 354; *Missouri* v. *Gehner,* 281 U. S., 313, 74 L. Ed., 870, 50 S. Ct., 326.

In *United States* v. *Waddill, Holland & Flinn, Inc.,* 65 S. Ct., 304, 306 (U. S. Supreme Court, Jan. 2, 1945), the question was whether in a state proceeding under a general assignment for the benefit of creditors, Sec. 3466 of the Revised Statutes, 31 U. S. C. A., Sec. 191, gave priority to a claim of the United States over a landlord's lien and a municipal tax lien. Whether such liens should take precedence depended on whether these liens had been perfected on the date of the assignment, and the determination of this question depended on the construction by the state court of the state statute. In refusing to follow the interpretation put on the state statute by the state court, the court said:

> "These interpretations of the Virginia statutes, as · propositions of state law, are binding. But it is a matter of federal law as to whether a lien created by a state statute is sufficiently specific and perfected to raise questions as to the applicability of the priority given the claims of the United States by an act of Congress. If the priority of the United States is ever to be displaced by a local statutory lien, federal courts must be free to examine the lien's actual legal effect upon the parties. A state court's characterization of a lien as specific and perfected, however conclusive as a matter of state law, cannot operate by itself to impair or supersede a long-standing Congressional declaration of priority."

A significant case, which upholds the supremacy of Federal law in the enforcement of Federal contracts, is *Gulf Oil Corporation* v. *Lastrap*, 48 Fed. Supp., 947 (Dist. Ct. S. D. Tex. 1943), which holds that an insurance contract, authorized by federal law, was enforceable in Texas in spite of the rule of law in Texas that such contract was unenforceable there because the insured had no insurable interest.

If there was a reason for upholding the supremacy of Federal Law and for its uniform enforcement throughout the country in the instances above mentioned, there is even more in the case now before us. We are engaged in a great war in which the life of the nation is at stake. For the successful prosecution of that war the United States must borrow money. The price which it must pay for it depends on a number of factors — on whether its securities shall or shall not be free from taxation, on their maturity date, on their marketability, on the ease with which the title to them may be transferred. It is essential that the determination of these matters shall be in the exclusive control of the Federal Government. Otherwise we should have varying prices for these securities depending on the treatment to which they might be subjected by the laws of the different states where their situs might be. Above all else the capacity of the government to borrow at all depends on the inviolability of its obligation, on its ability to carry it out strictly in accordance with its terms. If the state may treat the bonds here involved, or the proceeds of their sale, as the property of some person other than the one whom the contract has designated, the government has thereby been prevented from carrying out the agreement into which it has entered. That the Treasury Department is fully conscious of this fact, and of the serious consequences which will flow from a failure to sustain Federal supremacy in this vital sphere, is evidenced by its appearance before this court to assert its rights and to call our attention to the fact that the sale of these bonds in the future

will be seriously hampered if its position in this and similar cases is not sustained.

We are not asked to overrule a rule of law already established in this state, but only to decide that, because of the supremacy of Federal law, the state rule has no application to this contract. This we have no hesitation in doing. The duty of the state in this instance is plain. As was said by a great Chief Justice: "Nor can it be inconsistent with the dignity of a sovereign State, to observe faithfully, and in the spirit of sincerity and truth, the compact into which it voluntarily entered when it became a State of this Union. On the contrary, the highest honor of sovereignty is untarnished faith. And certainly no faith could be more deliberately and solemnly pledged than that which every State has plighted to the other States to support the Constitution as it is, in all its provisions, until they shall be altered in the manner which the Constitution itself prescribes." *Ableman* v. *Booth,* 21 How., 506, 16 L. Ed., 169, 176.

The case is remanded to the Supreme Court of Probate for the entry of a decree sustaining the appeal and for such relief as is required by this opinion.

*So Ordered.*