These two cases come here upon appeals by the respective plaintiffs from judgments of the Superior Court in Mecklenburg County, rendered upon an agreed statement of facts submitted in a controversy without action under G.S., 1-250.
The cases are similar in their main features, although the stipulations somewhat vary. They were argued together here, and will be considered together in the opinion.
In No. 527, the controversy is between the administrator of the estate of Mrs. Leona S. Reid, deceased, and Mrs. Nannie S. Conn, and involves the ownership of one U.S. Savings Bond, Series D, issued in April, 1941, with maturity value of $1,000, registered in the names and payable as follows:
"Mrs. Leona S. Reid, 809 South Tryon Street, Charlotte, N.C. payable on death to Mrs. Nannie S. Conn, R. F. D. #2, Adairville, Ky."
The bond was found by the plaintiff administrator in a lock box of Mrs. Leona S. Reid in her bank in Charlotte, N.C. to which box she alone had access during her lifetime. The defendant is a surviving sister of Mrs. Reid. Mrs. Reid left surviving her, also, one son, J. Cheston Woodall, as her only heir and next of kin, who is not a party to this submission.
The bond contains on its face, and as part of it, the following provision:
"This is a U.S. Savings Bond of Series D, authorized by the Second Liberty Bond Act, approved September 24, 1917, as amended, and issued pursuant to Treasury Department Circular No. 596, dated December 15, 1938, to which reference is made for a statement of the rights of holders, as fully and with the same effect as though herein set forth."
Circular No. 596 referred to, in its turn refers to Circular No. 530, Second Revision, dated 15 December, 1938, containing the regulations *Page 269 
issued by the Treasury Department, defining the rights of the parties. A pertinent part of those regulations is as follows:
"4. Payment or reissue after death of owner and later death of beneficiary. — Upon proof of the death of the registered owner and of the subsequent death of the beneficiary, the bond will be paid or may be reissued as though the beneficiary had been the registered owner."
After the date of the issue of this bond, the Treasury regulations then in force provided that such bonds could be issued in the name of one person, payable on death to a single designated beneficiary in his own right.
In No. 528, the controversy is between the executor of the will of Charles H. Frederickson, deceased, as plaintiff, and Mrs. Carolyn G. Frederickson, his surviving wife, as defendant.
Immediately after its qualification as executor, the plaintiff found in an inner box or drawer in a safe located in the office or place of business of the testator, to which both testator and defendant had equal access prior to testator's death, and took into its possession, certain U.S. Savings Bonds of Series C; U.S. Savings Bonds of Series D; U.S. Defense Savings Bonds of Series E; and U.S. Savings Bonds of Defense Series F.
The several bonds of Series C, D, and F, and all but one of Series E, as described in the submission, were issued and registered in the following names and form: "Charles H. Frederickson or Mrs. Carolyn G. Frederickson." One Series E Defense Savings Bond, dated January, 1943, in the maturity amount of $500, was issued and registered as follows: "Mrs. Carolyn G. Frederickson or Charles H. Frederickson." All of the bonds described are issued in the names of co-owners, have upon the face of each proper references to the Circulars and Treasury Regulations under which they are issued, which regulations by reference are made a part of the bond. They all have substantially the following provisions, which are quoted from the regulations applicable to Series E, issued prior to January 1, 1943:
"(2) AFTER THE DEATH OF ONE CO-OWNER. — If either co-owner dies without having presented and surrendered the bond for payment to a Federal Reserve Bank or the Treasury Department, the surviving co-owner will be recognized by the Treasury Department as the sole and absolute owner of the bond, and payment will be made only to him:"
There are minor differences in the regulations relating to the bonds purchased from time to time which are not controversial, and which do not affect the decision.
Upon the facts as stated, the plaintiff in each case, and the respective defendants, claimed the ownership of the bonds in controversy.
In No. 527, the judgment of the court was that "defendant is the absolute owner of and entitled to the possession of the bond described in the *Page 270 
submission and agreed facts and that the plaintiff shall surrender and deliver the aforesaid bond to the defendant." From this judgment plaintiff appealed, assigning errors.
In No. 528, a similar judgment was entered, adjudging that "the defendant is the sole and absolute owner of and entitled to the possession of each, every and all of the bonds mentioned and described in the submission, and that the plaintiff surrender and deliver all of the aforesaid bonds to defendant." Plaintiff excepted and appealed, assigning errors.
If nothing else appeared, the conception of the Federal Government as creating a species of property, intended to have a situs within the State, and investing it with qualities and incidents of succession at variance with the State laws of descent and distribution, would make a disturbing picture. It would, indeed, be cause for challenge if the Congress undertook to legislate on the subject by general regulation of property rights within the field of State control. But there is no such general invasion of State governmental power or function involved in the controversy submitted to the Court. We are dealing with a special situation — the authority of the Federal Government, under its constitutional grant of power to borrow money, to regulate and adjust its contracts within the compass of that power, so that property in them may be subject to succession by survivorship, according to the terms of the contract, irrespective of the succession laws of the State generally applicable to that subject. It is the contention of the appellee in each case that the authority to make a contract with that provision and with that result is within the reasonable and necessary exercise of the constitutional power to borrow money and pledge the faith and credit of the Government for its repayment, and within the scope of the Acts of Congress, implementing the constitutional provision.
Clause 2 of sec. 8, Art. I, of the Federal Constitution, empowers Congress to borrow money on the credit of the United States; Clause 18 empowers Congress to make necessary laws for the execution of powers vested by the Constitution in the United States Government. Pursuant thereto the Congress enacted the Second Liberty Bond Act, sec. 22 of which, as amended, reads as follows:
"The Secretary of the Treasury, with the approval of the President, is authorized to issue, from time to time, through the Postal Service, or otherwise, bonds of the United States to be known as `United States Savings Bonds.' The proceeds of the Savings Bonds shall be available to meet any public expenditures authorized by law and to retire any *Page 271 
outstanding obligations of the United States bearing interest or issued on a discount basis. The various issues and series of the Savings Bonds shall be in such forms, shall be offered in such amounts within the limits of section 752 of this title, and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b) and (c) hereof, and including any restriction on their transfer, as the Secretary of the Treasury may from time to time prescribe." Act of Sept. 24, 1917, ch. 56, Sec. 22, as added by Act of Feb. 4, 1935, ch. 5, sec. 6, 49 Stat. 21, 31 U.S.C.A., sec. 757c.
Looking at the Constitutional grant of power and the implementing act alone, in their independent setting, it can hardly be denied that there is a clear and indisputable line of authority from the Constitution to Congress, and a delegable power in the Congress with respect to the Treasury Regulations involved, so long as they have a reasonable relation to the ends sought to be attained by the Constitution, and are fairly within the powers actually delegated to the Secretary of the Treasury. Assuming that the Regulations are of that character conflict with State law is immaterial. But as one of the recurring conflicts of authority, real or assumed, in our dual form of government, the appellants raise the question whether the Congress, in the details of its attempted exercise of power, has not transgressed on the reserved powers of the State.
Primarily, the possibility of conflict with State law has nothing to do with the question whether the transactions under review (referring to the contested feature of survivorship), are within the proper exercise of the constitutional power, and necessary or expedient to its exercise. Independently considered, they seem to have that logical and reasonable relation to the constitutional grant of power and the ends sought to be reached that would make the transaction impeccable.
The borrowing of money by the Government on the scale it has been carried on and is yet to be done, reaching incomprehensible billions in figures, is not a simple matter of getting a loan here and there and issuing a note of hand as an obligation to repay it. Under the Constitution, the Government might borrow from foreign governments or money lenders, if any might be found able to lend, or it might seek such loans in this country exclusively from big industry, banking institutions, private syndicates, or, intermediately, from government-created agencies; or it might, as it has undertaken to do, and with gratifying success, borrow directly from all its citizens and all other legitimate sources in the country. It would be well nigh criminal if the Government, in the placing of such vast loans, did not consider the political, economic, and social phases and consequences of its intended action, since, in all these aspects, the people are, necessarily, profoundly affected. These *Page 272 
considerations must be read into the constitutional grant of power which has been made to the Government.
None can question that it is a sound policy for the Government to borrow of its own people. The extension of these loans to as much of the citizenry of the country as might be possible tends to promote the stability of the Government, to strengthen its financial structure, to promote the prosperity of the people, and to establish relations of confidence and mutual understanding between the people and their Government. Moreover, in the scheme of financing the enormous national debt, so rapidly accumulating, it was necessary, and is necessary, for the Government to draw upon every resource the country affords; and to offer a form of investment loan which would appeal to persons of medium or low income, or to purchasers in small amounts, who constitute the great majority of the country's inhabitants.
There is no doubt that the survivorship feature in the form of investment offered by these bonds has been, and is, peculiarly attractive to millions of purchasers throughout the nation, and has been strongly influential in their widespread distribution. A recent statement from Washington estimates that at least eighty-five million persons in this country are holders of E type bonds. The security acquired by the simple act of purchase can hardly be overestimated as a factor in their sales and the satisfaction with which they continue to be held. $7,000,000, 000 of the $14,000,000,000 bond offer now being made is expected to be brought by private individuals. To question their validity, or deprive them of their most attractive feature, would seriously embarrass the Government in its attempt to make good its promises, cripple its bond sales, and no doubt have a serious effect on the permanence of these individually small, but in the aggregate large, investments.
This is, briefly, the background of policy and necessity behind the bond issues we are considering. We would not overstress the evident necessity which arises from the emergency of war and the immediacy of its demands, since the principles and policies we have tried to outline are as soundly observed in peace-time borrowings. We are simply stating the considerations which lead us to the conclusion that there is no feature of the bonds concerned in this controversy so extraordinary as would make them unfit subjects to be included, as necessary or expedient to the exercise of the borrowing power granted by the Constitution and implemented by the pertinent Act of Congress.
The case might end here with the statement of a corollary. But the appellant, in each of these cases, contends that in the resulting conflict of laws, the State law of distribution is paramount in its application to the disputed ownership of bonds and that such law, rather than the Federal *Page 273 
law, is controlling. And, although treading a rather beaten path, we come to that issue.
Article VI. Clause 2, of the Constitution of the United States, provides: "This Constitution and the laws of the United States which have been made in pursuance thereof; . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Even without such a provision in the Constitution, the principle stated is a fair conclusion to be drawn from a realistic and common sense appraisal of our dual form of government, as established by the Constitution. It is a question of livability in the relation of partners in the so far successful American adventure in democracy.
In the decided cases on this subject, reference is sometimes made to the fact that a treaty made with this Government by a foreign power is the supreme law of the land, as an instance of the supremacy of Federal law. There is at least an analogy. The Constitution of the United States is not a treaty; but the supremacy of the commitment which each state (and we mean also the people of the state), has made with each of the several states, and with all of them collectively, and embodied in the Constitution by grants to the newly created Federal Government, in order to achieve results looking to internal order and external security — objectives beyond the reach of any single state, rests upon the same principle. Exclusiveness is the life of the powers thus granted; and when a conflict arises between the state and Federal law with regard to the exercise of power within the reasonable scope of such exclusive grants, it seems to us axiomatic that the state law must yield.
But following the chain of authority through the special grants of power to which it relates, and the Acts of Congress made in pursuance thereof, we might make a categorical affirmance of the trial court without a serious break in the consecution.
The power given to the Secretary of the Treasury to make the regulations which we find incorporated by reference into the Savings Bonds was properly delegated by Congress. Hampton v. U.S., 276 U.S. 394, 72 L.Ed., 625;Buttfield v. Stranahan, 192 U.S. 470, 48 L.Ed., 525; U.S. v. Grimaud,220 U.S. 506, 55 L.Ed., 563; Bowles v. Willingham, et al.,321 U.S. 503, 88 L.Ed., 892; U.S. v. Sacks, 257 U.S. 37, 66 L.Ed., 118;U.S. v. Janowitz, 257 U.S. 42, 66 L.Ed., 120; Warren v. U.S.,281 U.S. 739. The regulations have the force and effect of Federal law.U.S. v. Birdsall, 233 U.S. 223, 58 L.Ed., 930; U.S. v. Janowitz, supra;Maryland Casualty Co. v. U.S., 251 U.S. 342, 64 L.Ed., 297; U.S. v.Sacks, supra. Thus they become, under and by virtue of Art. VI, Cl. 2, of the Constitution, cited supra, "the supreme law of the land." *Page 274 
Immunity of interference by local law with the instrumentalities created for the Government of the United States is a familiar principle. It has been frequently applied to taxation and many other forms of attempted regulation. Farmers Bank v. Minnesota, 232 U.S. 516, 58 L.Ed., 706;Missouri v. Gehner, 281 U.S. 313, 74 L.Ed., 830; McCulloch v. Maryland, 4 Wheat., 316; Osborne v. Bank of United States, 9 Wheat., 738; Ohio v.Thomas, 173 U.S. 276, 43 L.Ed., 698; Johnson v. Maryland, 254 U.S. 51,65 L.Ed., 126; Hunt v. U.S., 278 U.S. 96 73 L.Ed., 200; Arizona v.California, 283 U.S. 423, 75 L.Ed., 1134; Stewart Co. v. Sadrakula,309 U.S. 94, 84 L.Ed., 596; Mayo, et al., v. U.S., 319 U.S. 441,87 L.Ed., 1504; Irvine v. Marshall, 20 How., 558; Ruddy v. Rossi,248 U.S. 104, 63. L.Ed., 148; U.S. v. Emory, 314 U.S. 423,86 L.Ed., 315. The principle in all these cases is applicable to the subject under discussion.
Independently of this line of argument, we have no doubt that the validity of the contested feature of survivorship can be sustained against conflicting State law upon considerations applying to them as Federal contracts. It must be conceded that the regulations under review are a part of the bonds as contracts, not only because of the proper delegation of power to the Secretary of the Treasury to make them, which we conceive to be valid in the form made, but also because they are incorporated in the face of the bonds by adequate reference. Russell Co. v. U.S.,261 U.S. 514, 67 L.Ed., 778. As Federal contracts, the bonds are governed by Federal rather than State law. Irvine v. Marshall, supra; U.S. v.Clearfield Trust Co., 130 F.2d 93, C.C.A.3d, affirmed318 U.S. 363; Byron Jackson Co. v. U.S., 35 F. Supp. 665 (S. D. Calif.);U.S. v. Grogan, 39 F. Supp. 819 (D. Mont.); Kolker v. U.S.,40 F. Supp. 972 (D. Md.); Garrett v. Moore-McCormack Co., Inc.,317 U.S. 239, 87 L.Ed., 239; Warren v. U.S., 68 Ct. Cl., 634, cert denied 281 U.S. 739, 74 L.Ed., 1154.
Perhaps on close analysis, the exclusive application of Federal law to contracts of the United States stems from the principles already discussed, and assumes that the contracts are within the constitutional authorization. However, assuming that the contracts are appropriate to the exercise of the powers confided to Congress, it is quite clear that in determining the implications and consequences of the transaction, the Federal law applies to rights created under the Federal statute or arising out of it. Thus construed, the instant contracts made by the purchaser in behalf of himself and of the named beneficiary, or with named co-owners for the benefit of either or both, and in each case carrying with it full right of ownership to the surviving beneficiary or co-owner, are valid and beyond the reach of conflicting State law to modify or destroy. *Page 275 
The suggestion of the appellants that the provisions, here considered as conferring the absolute right of ownership on the survivor, merely constitute the designated persons as agents to make the collection, or receive payment of the bonds, must be rejected. The character of the instruments, the circumstances under which they are issued and sold, as well as the phraseology employed with reference to the final payment, negative the suggestion. We are not prepared to assume that the United States Government, after having given every assurance in the sale of the bonds, and more especially in their terms, which may readily be construed as conferring absolute ownership upon the surviving beneficiary or co-owner, would then, for its mere convenience, wash its hands of the transaction and further liability as to the proper application of the funds, by appointing, for the purpose of collection and payment only, a random person, without reference to his ability, in case of default, to respond to the real owner. Moreover, one clause in the regulations applicable to the whole question provides:
"Section 315.17: (a) Judicial proceedings. — The ownership of a savings bond or interest therein may be transferred or established through valid judicial proceedings; Provided, however, That no such proceedings will be recognized if they would give effect to an attempted voluntary transfer inter vivos of the bond or would defeat or impair the rights of survivorship conferred by these regulations upon co-owners and beneficiaries." (1943 Cumulative Amendments to Dept. Cir. No. 530, Fourth Revision.)
We have not overlooked the suggestion of the appellees that contracts of a similar nature have been held permissible under the State law; Jones v.Waldroup, 217 N.C. 178, 7 S.E.2d 366; but we prefer to rest decision on the fundamental principles above outlined, both for the sake of uniformity of decision and in order that we may not be supposed to have left the effectiveness of these contracts subject to the vicissitudes of State legislation.
Bonds of like issue and tenor as those involved in the submission, and containing the same provisions as to ownership and survivorship, with two or three exceptions, have been upheld in every jurisdiction where the question has been raised. Warren v. U.S., supra; In re Estate of LouisDiSanto, 142 Ohio St. 223, 51 N.E.2d 639; In re Stanley's Estate,102 Colo. 422, 80 P.2d 332; In re Deyo's Estate, 42 N.Y.S.2d 379,18 Misc., 32; Franklin Washington Trust Co. v. Beltram, 133 N.J. Eq., 11,29 A.2d 854; Laufersweiler v. Richmond, 22 Ohio Opinions, 265, 8 Ohio Supp., 76; In re Briley's Estate, 41 So.2d 595; Harvey v. Rackliffe
(Me.), 41 A.2d 455. To this may be added many unreported cases. *Page 276 
Appellants seem unable to cite any authority in support of their position except the two much criticized cases of Decker v. Fowler,199 Wn. 549, 92 P.2d 254, and Sinift v. Sinift, 229 Iowa 56,293 N.W. 841. They might have added the case of Deyo v. Adams (N. Y., 1942), 36 N.Y.S.2d 734. For comments on the Decker case, see 139 A.L.R., 967; 14 Wn. Law Rev., 312 (1939); 27 Minn. Law Rev., 401 (March, 1943). Both Deyo v. Adams and Decker v. Fowler have been repudiated by the legislatures of the respective states by statutes confirming the rights of surviving co-owners and beneficiaries as provided in the savings bonds. Wash. Rev. Stat. (Remington's Supp., 1943), secs. 1548-60, 61, and 40 McKinney's Consol. Laws of New York, Ann. (Supp. 1943), sec. 24.5. In re Deyo's Estate, supra, is contra
the holding in Deyo v. Adams, supra.
Our rather full discussion of these cases has been unavoidable because of issues raised in the argument.
The judgment of the lower court in both of these cases must be affirmed.
In No. 527, Affirmed.
In No. 528, Affirmed.